[No. S028747. Dec. 6, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
RODNEY JESSE SAN NICOLAS, Defendant and Appellant.

616

618

## Counsel

Wesley A. Van Winkle, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Eric L. Christoffersen, Harry Joseph Colombo, Charles A. French, Margaret Venturi and Jesse Witt, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**MORENO, J.**—A jury convicted defendant Rodney Jesse San Nicolas of the first degree murders of his wife Mary San Nicolas (also known as Mary James) and Mary's nine-year-old niece April James (Pen. Code, § 187, subd. (a)),[1] and found true the personal use of a knife allegations as to these murders. (§§ 12022, subd. (b)(1) (Mary), 12022.3, subd. (a) (April).) The jury also convicted defendant of forcibly raping April James (§ 261, subd. (a)(2)) and of forcibly committing a lewd and lascivious act upon her (§ 288, subd. (b)(1)), and found true the great bodily injury allegation connected with these two sex offenses (§ 12022.8). The jury found true four special-circumstance allegations: multiple murder (§ 190.2, subd. (a)(3)); killing to prevent a witness, April James, from testifying (§ 190.2, subd. (a)(10)); killing in the commission of the rape of April James (§§ 190.2, subd. (a)(17), 261, subd. (a)(2)); and killing in the commission of a lewd or lascivious act on a child under the age of 14, April James (§§ 190.2, subd. (a)(17), 288, subd. (b)(1)). After a penalty trial, the jury returned a verdict of death. The trial court denied the automatic motion to modify the penalty (§ 190.4, subd. (e)) and sentenced defendant to death. This appeal is automatic. (§ 1239, subd. (b).)

We affirm the judgment in its entirety.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

I. Facts and Proceedings.

A. *Guilt Phase.*

1. *Prosecution Evidence.*

a. *Background.*

In May 1990, defendant lived in a small two-bedroom home on the southern edge of Modesto, California with his wife, Mary James San Nicolas, and five of Mary's relatives, including 15-year-old Sun. and 12-year-old Sarah, Mary's daughters from earlier marriages. Two additional children belonging to Mary's brother, Anthony James, also were staying with the family for a few weeks—nine-year-old April and 12-year-old Arlo. Mary's stepfather, Eugene Lee, lived in a makeshift room in the detached garage beside the house. The house itself had a single bathroom and four main rooms. The front door opened into the living room, which was divided into half by a chest of drawers and cabinet. Mary slept behind the chest and cabinet on a fold-out bed. To the right of the living room was the front bedroom, which Sun. shared with April. At the rear of the house, and accessible only through the first bedroom, was a second bedroom, which Sarah and Arlo shared.

Defendant and Mary were first married in 1987 and lived together for a short time, but defendant was convicted of embezzlement and sent to prison shortly thereafter. Defendant returned to the house after his release in September 1989. Upon his return, he and Mary began having marital problems relating to his inability to find a job and support the family. Defendant and Mary argued frequently, resulting in defendant sometimes sleeping in the fold-out bed and sometimes in the living room rocking chair.

Defendant and Mary both drank heavily, which exacerbated the frequent arguments between the two. On Friday, May 4, 1990, defendant turned down a job offer, saying he had to pick up Sarah from camp instead. On Saturday, May 5, Mary told a coworker that she and defendant had been arguing about money, that he would not work or attend the job interviews she obtained for him. The coworker recounted that Mary told her that defendant had requested money a number of times the previous week but that Mary had refused, stating, "I wonder what he's going to do to me." That same evening, defendant went to the Hide Out bar, a country-western nightclub on the outskirts of Modesto, and spoke with Linda Lee Ollar, making derogatory comments about women in general and later about Mary. He stated that he had come there to look for Mary, and "whatever I do, she's going to know what she's lost." Ollar remarked to the bouncer that defendant was "going to murder his wife if she comes in . . . ."

b. *Events of May 6, 1990.*

Early the next morning, on Sunday, May 6, Mary and her stepfather, Eugene Lee, began drinking beer in the backyard with some of Lee's friends. The gathering soon turned into a backyard barbecue, with a number of people in attendance. Defendant remained apart from much of the group, appearing to be angry. He commented to Rusty James, Mary's brother, that he was tired of drunks. Twelve-year-old Daniel H., a next-door neighbor, testified that he had heard defendant and Mary arguing that afternoon in the backyard. Daniel heard defendant tell Mary, "You stupid bitch, just wait until I get you." Defendant then grabbed Mary by the arm, pushed her against the back wall of the house, and told her, "this is what you deserve." According to Daniel, Mary was crying during this exchange and told defendant to stop. Daniel thought both defendant and Mary were drunk.

The party continued in the backyard, and a number of friends of Mary and Eugene Lee had joined the group. Defendant was drinking by himself at a table near the kitchen door, remaining aloof from the group in the backyard. At some point after 6:45 p.m., but before sunset at 7:45 p.m., Mary went inside the house to use the restroom and did not return. Eugene Lee later entered the house to look for food in the kitchen. He saw defendant and Mary on the hide-a-bed, arguing over defendant's lack of job prospects. Mary told defendant that he would have to leave, to which defendant did not respond.

About 8:30 p.m. that night, Arlo returned to the house. Defendant came to the door and opened it to let Arlo in, and directed him to go to the kitchen and get some dinner. Arlo asked defendant where his sister April was, and defendant replied that April had gotten scared so he had taken her home. As Arlo walked through the living room, he noticed that Mary was lying on her back on the hide-a-bed couch, with her feet out straight, her arms at her sides, and the covers pulled up to her chin.

Sun. returned home soon after, accompanied by her friend, Robert E. Sun. noticed that defendant was wearing cut-off sweat pants, not the same clothing he had been wearing earlier in the evening. She observed defendant sitting on Mary's bed, with Mary lying in the position described above. Sun. attempted to greet Mary, but defendant warned her not to disturb her mother, as she had passed out.

Sarah returned home at 9:00 p.m. accompanied by her friend Rodney S. Sarah and Rodney went straight to Sarah's bedroom, and Rodney noticed that defendant appeared nervous but not intoxicated. Rodney and Robert E. departed the home shortly after 9:00 p.m.

About 9:15 p.m., Mary's cousin, Lois, approached the main house. Defendant came out of the back door and told her that nobody was there, and that

Mary was at the house of Lois's grandfather, that the children were in church, and that April had been picked up by her parents. Lois tried to enter the home, and defendant refused her entry, again stating that he was there by himself. Lois testified that defendant appeared very nervous and scared, and was holding a knife in one hand and a cloth in the other.

Just past 10:00 p.m., Sun. received a call from a friend on the phone in her room. Shortly thereafter, Arlo wanted to call his parents, but could not get a dial tone. Defendant explained to them that the phone was not working because Mary had knocked it into the dog's water dish. Everyone went to bed about this time. Sun. testified that she stayed awake for some time that night, and at one point heard a door close and saw defendant leaving the house. She heard a car start up outside, and soon fell asleep. Later the following day, Eugene Lee discovered that the telephone line that ran into Sun.'s room had been cut outside her bedroom door.

### c. *Discovery of the Bodies.*

On Monday morning, May 7, Sun., Sarah, and Arlo found a note from defendant on the kitchen table, stating, "Mom and I went out for a while. Behave yourselves and we will see you after school. Love you both, M [Mom] and N. [Nick]."

Shortly thereafter, Sarah and Arlo discovered Mary's body behind the couch. The body of April James was found in the bathroom by the bathtub, concealed in an alcove shelf area behind some boxes.

Mary's body was dressed in a long cotton nightgown, the front of which was covered with bloodstains. Her left jawbone was fractured, there were bruises on her chin and neck, and a five-inch-long cut on her neck had severed both carotid arteries. There were 17 stab wounds to Mary's chest, five of which would have been fatal. According to testimony of the pathologist, Dr. William Ernoehazy, Mary's wounds were caused by a reasonably sharp knife about one to two inches wide and eight to 10 inches long. Several flat, triangular-shaped wounds indicated that the knife had broken during the attack, but the assailant had continued to use it. Mary's heart had been penetrated by a knife four times, her left lung eight times, and her right lung two times. The blood-alcohol level in Mary's body was 0.13 percent. The cause of death was the cut to Mary's throat and the stab wounds to her chest.

April's body was dressed in a long-sleeved sweatshirt that was soaked in blood. She had multiple stab wounds in her chest and back, and a linear defensive cut on her left wrist. The chest wounds, two of which punctured the heart, were determined to have been the cause of death. There was an

extensive tear on the perineum adjacent to the area between the vagina and anus. The coroner testified that April's vagina had been penetrated by an erect penis. However, visual and microscopic examination of the wound showed that there had been no hemorrhage in the tissue surrounding the tear, suggesting that there was no blood pressure in the area of the perineum at the time of penetration because the heart had fully or nearly ceased beating at the time. The coroner concluded that there still could have been some "flickering" of the heart muscle at the time of penetration, and that the penetration began "before the time of death."

A search of the residence found a rug that was missing from the bathroom stained with blood and hidden near the water heater. Blood spots and spatters were present on the bathroom wall, the rug by the bathtub, on the bathroom floor, and on the bathroom shelving. A chef's knife with a broken tip, and the broken tip itself, were found lying on top of some garbage in a box in the kitchen.

### d. *Escape from Modesto and Capture.*

Bank of America records indicate that, on May 6, 1990, defendant used Mary's automatic teller machine (ATM) card to obtain cash and make small purchases in Ceres, Modesto, and South Lake Tahoe. On May 7, 1990, at 7:00 a.m., Jack Miles, who operated the Sierra Auto Service in Chilcoot, California, found defendant stranded on Highway 395 in a Mercury Cougar. Miles towed the vehicle back to Chilcoot and determined that a new engine was needed. Defendant indicated he would return later for the car, and convinced Miles to take him to the Reno airport.

On Wednesday, May 9, Rusty James received a telephone call from the manager of the Golden West Motel in Reno, Nevada. The manager stated that a Robert James had left his duffel bag in a room two days prior and had not returned to reclaim it. Rusty James told the manager to call the police, and he then telephoned the Stanislaus County Sheriff's Department.

By the morning of Thursday, May 10, defendant's photograph and a summary of the offenses for which he was wanted were published in a Reno newspaper. Defendant was spotted and arrested later that day in Sparks, Nevada, and taken to the Sparks, Nevada jail.

On Wednesday, May 16, Detective Bennett and Deputy Viohl transported defendant back to Modesto. At some point during the ride back to Modesto, defendant told Detective Bennett that he wanted to talk to him about the case. Detective Bennett responded that they were nearly in Modesto, and asked defendant to wait until they arrived at the sheriff's office.

### e. *Defendant's Admissions.*

Upon arrival at the sheriff's office, at approximately 10:00 p.m. on May 16, 1990, Detective Bennett escorted defendant to an interview room, and conducted an audiotaped interview. The interview was played to the jury, and each juror was provided a transcript of the interview. At the outset of the interview, Detective Bennett read defendant his *Miranda* rights,[2] which defendant waived. The interview lasted two hours. Defendant admitted killing both Mary and April James. He stated that he and Mary had been drinking that afternoon, and after the barbecue ended in the early evening, Mary had returned to the house to go to sleep. At that point, an argument broke out between the two. Mary criticized defendant for not looking for work and not helping out around the house, calling him useless. The argument was briefly interrupted by April, who came out of the bedroom. Mary told April that everything was all right and to return to the bedroom. April returned to the bedroom, the argument continued, and soon defendant simply exploded. He did not remember specifically losing his temper, but went into the kitchen, got a knife, and returned. As she lay flat on the bed, defendant repeatedly stabbed her. He stated that he may have used more than one knife in the attack.

Defendant then went to the bathroom. As he stood at the bathroom sink still holding the knife, he saw in the mirror April standing behind him. April said nothing. He grabbed April by the shoulder and began stabbing her with the knife. April put up her hands to block the blows, but ultimately she fell to the floor.

Defendant initially denied to Detective Bennett that he had sexually abused April, but eventually admitted that after she was dead he had inserted his erect penis and fingers into her vagina. He said he quickly stopped and did not ejaculate. Defendant then picked up April's body, put her in the corner, and placed a blanket over her. He hid the bathroom rug near the water heater. Defendant could not explain why he had killed April, emphasizing that he "wasn't even thinking about April" during the time he was stabbing Mary. At no point after seeing April in the bathroom did defendant speak to her or ask her not to tell anyone what he had done. In response to Detective Bennett's suggestion that he had killed April to prevent her from reporting him, defendant responded, "I wasn't thinking about that, I don't even know why I did that I really don't, those thoughts weren't even in my head of her saying anything . . . ."

Defendant then returned to Mary's body and sat beside it for half an hour. During this time, Sun. came home. Defendant covered Mary's body up to her

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*).

neck with the blanket to hide the wounds and make it appear as though she were asleep. After Sun., Arlo, and Sarah had gone to sleep, defendant placed Mary's body behind the hide-a-bed and folded the bed up. He then changed his clothes, put his bloody jeans in the dirty clothes hamper, and began to pack his things. Defendant took Mary's car and departed between 10:00 and 11:00 p.m. He admitted using her ATM card to purchase gasoline and get cash.

Immediately following the interview with Detective Bennett, shortly after midnight on May 17, 1990, Dr. Phillip Trompetter, a clinical psychologist, began his interview of defendant. Defendant admitted that he had a "short fuse," but generally could control it. Defendant admitted that he had been angry during the killings and that he then had a lot of regret and shame regarding his sexual behavior with April. He claimed April's murder was a result of anger, that he had been mad, and that he did not understand why he had engaged in sexual behavior with her.

### 2. Defense Evidence.

Defendant did not testify at the guilt phase proceedings.

Defendant called as a witness Mary's ex-spouse, Steve Harvey, to establish that defendant had been provoked into killing Mary due to Mary's relationship with Harvey. Harvey admitted that he and Mary had spoken about getting back together after Harvey's release from prison on May 11, 1990, and stated that defendant had been borrowing his wife, his kids, and his house. Harvey added that Mary only had to ask him to return to the house; if so, defendant would have had to move out. On cross-examination, Harvey stated that he had last seen defendant in February 1990, and denied threatening defendant or telling him that he was going to take Mary away from him, although Mary had told him by telephone that she wanted defendant out of her house.

Dr. William Vicary, a forensic psychiatrist, testified that defendant was a very quiet, introverted man who exploded into a frenzy at the time of Mary's killing, and this frenzy carried over to when April happened onto the scene. This rage lasted several minutes, but subsided by the time that Arlo, Sun., and Sarah returned home. Dr. Vicary also stated that defendant was impaired by alcohol, but not to the degree that he did not know what he was doing.

Lina Weidman, an investigator for the district attorney's office, testified that Lois L. (Mary's cousin) had stated that defendant and Mary argued constantly, oftentimes about Steve Harvey. Lois further stated that when Mary consumed alcohol, she would physically confront defendant, who would then have to physically restrain her.

Finally, defendant called Dr. Thomas Rogers in an attempt to rebut the testimony of the pathologist. In the opinion of Dr. Rogers, the photograph of April's perineal tear was consistent with the child's having been dead at the time the vagina was torn. He acknowledged that a stab wound to the heart may not have killed April immediately, and that her actual death may have been later than estimated.

### B. *Penalty Phase.*

#### 1. *Prosecution Evidence.*

The prosecution submitted its case based on the evidence presented at the guilt phase, coupled with the six stipulated prior convictions. The six prior prison term allegations under section 667.5, subdivision (b) included: (1) a November 3, 1978, conviction for tendering a check with insufficient funds (§ 476a); (2) a July 29, 1981 conviction for forgery of a driver's license or identification card (§ 470); (3) a July 29, 1981 conviction for tendering a check with insufficient funds (§ 476a); (4) an October 22, 1981 conviction for escape from prison (§ 4532, subd. (b)); (5) a May 18, 1984 conviction for forgery of a driver's license or identification card (§ 470); and (6) a March 24, 1987 conviction for grand theft (§ 487, subd. (a)).

#### 2. *Defense Evidence.*

Defendant did not testify.

Defendant introduced testimony by his parole officer, Gordon Fradeen, that defendant had no prior history of violence and had behaved well while in jail, in prison, and on parole.

Dr. Trompetter testified that at the time of the murders, defendant had an emotional explosion of anger, rage, and fury. He testified that defendant was remorseful about the two killings, but ashamed and reluctant to talk about April James. Dr. Trompetter could not state an opinion as to whether the sexual act with April was the result of rage or sexual motivation. Dr. Trompetter further stated that he found no evidence of schizophrenia or organic brain disorder.

Defendant's younger brother, Ricardo San Nicolas, stated that his brother was quiet, nonviolent, and came from a religious family. Defendant's cousin, Anthony San Nicolas, testified that defendant's mother was like a drill sergeant and excessive in her discipline. He thought defendant's family was emotionally cold and shared little affection with each other.

Anna Hackett, an office assistant for the Department of Corrections, testified that she knew defendant when he worked as a clerk at the Sierra Conservation Center in 1987 and 1988 and stated that he was responsible, reliable, and trustworthy.

Dr. Gretchen White, a clinical psychologist, opined that defendant's personality makeup, his inability to express himself, his impulsiveness, his lack of control over his emotions coupled with his use of alcohol, his conflicts with Mary, and the shunning he experienced at the Sunday party the day of the killings all were factors that led to his explosive behavior. She said that his rage explosion was understandable, but not predictable. She suspected that defendant was overcome by emotion during the killings, and was not completely rational, intact, and aware. On cross-examination, White conceded that defendant did not have hallucinations, did not suffer from brain damage, and was not psychotic, unconscious, in a fugue state, or asleep when the crimes occurred. Finally, she asserted that he also knew what he had done was wrong.

## II. Pretrial Issues.

Defendant charges that the trial court erred by questioning jurors itself and by refusing to conduct individual, sequestered voir dire, in violation of his Sixth Amendment right to an impartial jury and Fourteenth Amendment right to due process of law. His claim is without merit.

### A. *Background.*

Prior to jury selection, the trial court indicated that it would conduct all voir dire questioning itself, and that such voir dire would take place in open court pursuant to Proposition 115.[3] All prospective jurors were given a 25-page juror questionnaire, three pages of which were devoted to a number of death penalty qualification issues. During group voir dire, the jurors were asked whether they had any beliefs that would prevent them from weighing fairly the aggravating and mitigating evidence, whether they had personal feelings that would require voting for guilt, and whether they would always vote for the death penalty regardless of the evidence. The court asked follow-up questions on an individual basis to those jurors for whom the court

---

[3] Proposition 115, enacted on June 5, 1990, made revisions to section 223 of the Code of Civil Procedure. The revised section gives the trial court discretion in the manner in which it conducts the voir dire of prospective jurors, but requires that, "where practicable, [voir dire shall] occur in the presence of the other [prospective] jurors . . . ." (Code Civ. Proc., § 223; see, e.g., *People v. Waidla* (2000) 22 Cal.4th 690, 713 [94 Cal.Rptr.2d 396, 996 P.2d 46].) See *People v. Stewart* (2004) 33 Cal.4th 425, 455, footnote 17 [15 Cal.Rptr.3d 656, 93 P.3d 271], for a discussion of subsequent amendments to section 223.

felt an additional inquiry was necessary. The court also invited counsel on several occasions to propose additional questions to ask on voir dire.

Both the defendant and the prosecutor requested individual, sequestered voir dire at various points. In rejecting the claim, the trial court noted that the law made no special exception for death penalty cases unless open voir dire was not practicable. The court stated that it would keep this "where practicable" language in mind at all times, and would reconsider the decision should it be demonstrated that group voir dire was not "practicable." The court also indicated that it recognized its power to order individual sequestered voir dire, but that it saw no grounds to do so and did not believe that the open voir dire was causing the jurors to respond mechanically or parrot the responses of other jurors.

### B. *Discussion.*

■ First we consider defendant's claim that the trial court erred by questioning jurors itself. Code of Civil Procedure section 223 states that the trial court, rather than the attorneys, should conduct an initial examination of prospective jurors. (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 299–300 [279 Cal.Rptr. 592, 807 P.2d 434]; see also *People v. Stewart, supra,* 33 Cal.4th at p. 455, fn. 17.) Upon a showing of good cause, however, the court may supplement the examination by permitting the parties themselves to conduct further inquiry or submit additional questions to the court. (*Tapia, supra,* 53 Cal.3d at pp. 299–300.) In this case, the trial court conducted the examination of prospective jurors, but on numerous occasions invited counsel to propose questions to fill in any gaps or omissions in the questioning. This technique was sufficient to test the jury for bias, and thus the trial court did not abuse its discretion. (*People v. Waidla, supra,* 22 Cal.4th at pp. 713–714.)

Defendant argues that *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80 [168 Cal.Rptr. 128, 616 P.2d 1301] requires individual, sequestered voir dire of prospective jurors in capital cases with respect to all death qualification issues. In *People v. Waidla, supra,* 22 Cal.4th at page 713, we recognized that Proposition 115 abrogated *Hovey.* There is no need for us to revisit this issue.

The trial court also did not abuse its discretion in determining that group voir dire regarding death qualification was "practicable" in this case. (Code Civ. Proc., § 223; *People v. Box* (2000) 23 Cal.4th 1153, 1178 [99 Cal.Rptr.2d 69, 5 P.3d 130]; *People v. Waidla, supra,* 22 Cal.4th at pp. 713–714.) The trial court recognized it had discretion to order individual voir dire if group voir dire was impracticable. Defendant contends that group voir dire would lead to prospective jurors giving stock answers to death qualification questions. An examination of the record does not support this contention. The

court asked follow-up questions to individual jurors, and considered an extensive questionnaire devoted to a number of death qualification issues. The court's questioning covered the range of issues necessary to establish bias and test the prospective jurors' feelings and attitudes toward the death penalty. We conclude that the trial court did not abuse its discretion. (*People v. Waidla, supra,* 22 Cal.4th at pp. 713–714.)

## III. GUILT PHASE ISSUES.

### A. *Penal Code Section 1157.*

The verdict form returned by the jury for count I states, "We, the Jury in the above entitled cause, find the defendant, RODNEY JESSE SAN NICOLAS GUILTY of the offense of MURDER, Violation of Section 187 of the California Penal Code, a felony, as charged in Count I of the Information. [¶] We further find that in committing the offense of MURDER, the defendant (did/did not) act willfully, deliberately, and with premeditation." The phrase "(did/did not)" appears below a blank underline. The verdict form for count II is identical to the verdict form for count I, but for the substitution of the phrase "Count II" for "Count I." For both counts I and II, the jury handwrote the word "DiD" in the blank space, indicating that "defendant DiD act willfully, deliberately and with premeditation."

Section 1157 provides: "Whenever a defendant is convicted of a crime or attempt to commit a crime which is distinguished into degrees, the jury . . . must find the degree of the crime or attempted crime of which he is guilty. Upon the failure of the jury . . . to so determine, the degree of the crime or attempted crime of which the defendant is guilty, shall be deemed to be of the lesser degree." Defendant contends that because the verdict forms for counts I and II fail to state the degree of murder, he stands convicted of second degree murder pursuant to section 1157. We disagree.

█ Section 1157 applies "whenever the jury neglects to explicitly specify the degree of the crime" in the verdict form (*People v. McDonald* (1984) 37 Cal.3d 351, 381 [208 Cal.Rptr. 236, 690 P.2d 709] (*McDonald*), overruled in part by *People v. Mendoza* (2000) 23 Cal.4th 896, 914 [98 Cal.Rptr.2d 431, 4 P.3d 265] [§ 1157 does not apply in first degree felony murder when the question of degree is not before the jury]). In *McDonald*, a jury returned a verdict form stating only that the defendant was " 'guilty of *MURDER*, in Violation of Section 187 Penal Code, a felony, *as charged in Count I of the information.*' " (*McDonald*, at p. 379.) The verdict form did not ask the jury to determine whether the murder was of the first degree. (*Ibid.*) In rejecting the argument that the determination of degree could be inferred from the jury's separate finding on the special circumstance, which necessarily presupposed first degree murder, we stated: "[T]he key is not whether the 'true

intent' of the jury can be gleaned from circumstances outside the verdict form itself; instead, application of [section 1157] turns only on whether the jury specified the degree in the verdict form." (*McDonald,* at p. 382.) We therefore reduced the murder to second degree. (*Ibid.*)

In *People v. Campbell* (1870) 40 Cal. 129, 132, the jury verdict form noted only " 'guilty of the *crime* charged,' " and did not specify a degree. Thus, in both *McDonald* and *Campbell,* the verdict form itself failed to delineate the required elements of first degree murder in section 189, i.e., "any . . . kind of willful, deliberate, and premeditated killing."

There is no such infirmity here. In the verdict form itself, the jury made the specific finding that defendant, in committing the murders, "did act willfully, deliberately, and with premeditation."[4] This is tantamount to a finding of first degree murder in the verdict form itself and section 1157 is therefore not implicated.

This conclusion is supported in case law. In *People v. Goodwin* (1988) 202 Cal.App.3d 940, 946 [249 Cal.Rptr. 430] (*Goodwin*), the verdict forms returned by the jury found the defendant " 'guilty of residential burglary, in violation of Penal Code section 459, a Felony, as charged in Count I [and Count II] of the information.' " The Court of Appeal held that "section 1157 does not apply to reduce the degree of the offenses, because the verdict forms did not find appellant guilty simply of burglary without any indication of the degree. The jury's verdict form did specifically find appellant guilty of 'residential burglary . . . as charged' in the information which alleged the burglary of an 'inhabited' dwelling. 'Every burglary of an inhabited dwelling house . . . or the inhabited portion of any other building, is burglary of the first degree.' (Pen. Code, § 460.) There is also 'no practical difference between burglary of an inhabited dwelling house and residential burglary.' [Citation.] Accordingly, since the verdict forms specified 'residential burglary' and referred to the information which described 'an inhabited dwelling house,' necessarily constituting burglary of the first degree, the jury satisfied [*McDonald*'s] requirement that it specify the degree 'in the verdict form.' [Citation.] [¶] There is no logical reason to compel the fact finder to articulate a numerical degree when, by definition, 'first degree burglary' and 'residential

---

[4] Section 189 states, "All murder which is perpetrated by means of a destructive device or explosive, a weapon of mass destruction, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, *or by any other kind of willful, deliberate, and premeditated killing*, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under Section 206, 286, 288, 288a, or 289, or any murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree. All other kinds of murder are of the second degree." (Italics added.)

burglary' are one and the same thing." (*Goodwin, supra,* 202 Cal.App.3d at p. 947; see also *People v. Atkins* (1989) 210 Cal.App.3d 47, 51–52 [258 Cal.Rptr. 113].)

■ *Goodwin* controls here. Section 189 defines first degree murder as "any . . . kind of willful, deliberate, and premeditated killing." The jury verdict forms specifically state that defendant, in committing the murders, "did act willfully, deliberately, and with premeditation." "There is no logical reason to compel the fact finder to articulate a numerical degree when, by definition, 'first degree [murder]' and '[willful, deliberate, and premeditated killing]' are one and the same thing." (*Goodwin, supra,* 202 Cal.App.3d at p. 947.) The statutory mandate of section 1157 was met even without the express use of the phrase "first degree murder" in the verdict forms.

### B. *Admission of Defendant's Statements.*

Defendant moved in limine to suppress several statements he made to the police. After a suppression hearing, the trial court suppressed certain statements obtained in violation of *Miranda, supra,* 384 U.S. 436, but admitted subsequent incriminating statements made after defendant received a *Miranda* warning. Defendant on appeal makes essentially three claims under the Fifth and Fourteenth Amendments to the United States Constitution related to his statements to law enforcement: (1) the statements he made to a Nevada police officer and Detective Bennett following his arrest on May 10 were obtained in violation of *Miranda* and these statements tainted his May 16 and May 17 statements, obtained after a valid *Miranda* waiver; (2) because he was not re-*Mirandized* prior to his May 17 interview with Dr. Trompetter, that interview should have been suppressed; and (3) his May 16 and May 17 statements violated *Edwards v. Arizona* (1980) 451 U.S. 477, 484–485 [68 L.Ed.2d 378, 101 S.Ct. 1880] (*Edwards*), because Detective Bennett ignored defendant's repeated requests for an attorney on May 10, and then showed him a Modesto Bee newspaper article concerning his crime on May 16. We consider each of these claims in turn.

### 1. *The May 10 Statements and the May 16 Statement.*

Defendant claims that his May 10 statement, because it was obtained illegally, tainted the subsequent tape-recorded statement that was obtained after defendant was advised of and waived his *Miranda* rights. We disagree. Even though defendant's first statement on May 10 was obtained without a *Miranda* advisement, we conclude that because it was voluntarily given, it did not taint the subsequent recorded confession.

a. *Evidence from the Suppression Hearing.*

The prosecutor stipulated that defendant was arrested on May 10, 1990, in Sparks, Nevada, taken to an interrogation room at the Sparks, Nevada Police Department and placed in an interview room that was monitored by video-tape. The videotape was played in court. The prosecutor further stipulated that defendant was first questioned by an unknown Nevada police officer and then by Detective Bennett, and that neither law enforcement officer adminis-tered defendant his *Miranda* rights.

The videotape revealed that an unidentified Nevada police officer asked defendant about the present location of the car defendant had been driving. Defendant first stated he could not remember the name of the town, but later stated it may have been Chilcoot, Nevada. Defendant also informed the officer that he left his blue duffel bag in a motel. The conversation was not continuous and is fairly characterized as miscellaneous small talk. The conversation eventually terminated, and the Nevada police officer left the room.

Shortly thereafter, Detective Bennett entered the room, introduced himself, and asked defendant if he wanted to make a statement. Detective Bennett stated in part, "[I]f you want to talk to me, I'll advise you of your rights. You've probably heard them before, you know? And I'd really like to hear your side of it." After Detective Bennett told defendant that it was his impression that defendant wanted to speak to him, defendant responded, "I don't know how you got that impression. I would like to talk to an attorney first and then I'll talk to you." Detective Bennett responded, "You've got that coming." Defendant repeated his earlier statement, "I just want to talk to an attorney first, that's all." Detective Bennett responded, "OK. But you don't have anything to say to me at this point?" Defendant replied, "No." He added that he was concerned for his safety once in Stanislaus County.

After discussing the precautions he could take to ensure defendant's safety, Detective Bennett stated: "You mentioned that you did want to talk to me, but you wanted to talk to an attorney first. I'll just say this: often times, when a person gets an attorney, the attorney tells them not to talk, and that's the advice." Defendant replied, "I know that." Detective Bennett continued, "And that's their job, and that's what they do, and they're entitled to their opinion. But it's still your case and it's still your life, and that's the decision you have to make." Defendant responded, "I know what to expect from them, but I just want to talk to them first. You've got that coming and I'll talk to you."

After an additional discussion regarding extradition, Detective Bennett later returned to this topic: "I'll only say this one more time. You mentioned

to me about your attorney. You want to talk to him. You've already talked to me, you thought you owed me that at least. If between now and tomorrow, or between now and the time we get back to Modesto you change your mind about that, let me know so I can set up a time we can talk in an interview room like this. You know, private. It's not going to be in the jail or anything like that. You may change your mind, and I want you to know you have the option to do that. Whatever you want to do." The interview was terminated.

Defendant was then transferred to a county jail in Reno, Nevada. On May 14, a complaint and declaration of probable cause was filed in the Justice Court of Reno Township, County of Washoe, State of Nevada. On May 15, defendant was arraigned and indicated to the Nevada magistrate that he wished to waive extradition, and the waiver of extradition was filed.

On May 16, defendant was moved to Modesto by Detectives Bennett and Viohl. They arrived at the sheriff's office at approximately 10:00 p.m. Bennett and Viohl escorted defendant to the interview room, removed his restraints and read him the *Miranda* warnings. Defendant waived his *Miranda* rights[5] and began his roughly two-hour statement. The entire interview was tape-recorded.

The trial court ruled that defendant's May 16 statement to Detective Bennett was admissible. Although agreeing that the May 10 statement was illegally obtained and should be suppressed, the court found that given the six-day "separation of time and space [and] geography," there was factually "very little" to support defendant's claim that Detective Bennett's statements on May 10 coerced him into making a statement on May 16. Instead, "defendant's desire was to explain to the detective what happened to either justify, excuse or to relieve his soul of these things that were on his mind, which, of course he has the right to do."

b. *Discussion.*

Defendant correctly asserts, and the Attorney General concedes, that defendant was not *Mirandized* in Nevada and that defendant's May 10 statements were properly suppressed at trial. But we do not agree with defendant's further assertion that the May 10 statements tainted defendant's May 16 statement, such that the latter should have been suppressed. In

---

[5] Detective Bennett stated: "You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you're being questioned. If you cannot afford to hire a lawyer one will be appointed to represent you before any questioning if you wish one. Do you understand each of the rights I have explained to you." Defendant replied: "Yeah." Detective Bennett: "Having these rights in mind do you wish to talk to me now?" Defendant: "Yeah."

*Oregon v. Elstad* (1985) 470 U.S. 298, 309 [84 L.Ed.2d 222, 105 S.Ct. 1285] (*Elstad*), the high court rejected the notion that a subsequent confession must necessarily be excluded because it followed an otherwise voluntary statement that was given without *Miranda* warnings.

██ In *Elstad,* an officer had come to the defendant's home to arrest him. Without providing the required *Miranda* advisement, the officer asked the defendant if he knew why the officer was there and if he knew the burglary victims. The defendant's response was incriminating. The defendant later gave a full statement at the police station after having been advised of and having waived his *Miranda* rights. The high court held that despite the officer's initial failure to administer warnings to the defendant, the defendant's statement at the station need not be suppressed: "[A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." (*Elstad, supra,* 470 U.S. at p. 314; accord, *Missouri v. Seibert* (2004) 542 U.S. 600 [159 L.Ed.2d 643, 124 S.Ct. 2601, 2611–2612].)

Despite the failure to administer *Miranda* warnings, there is nothing in the record to suggest that defendant's statements on May 10 were involuntary, or that they were particularly incriminating. As the videotape indicates, defendant answered a few questions posed by the Nevada police officer concerning the location of his car and his duffel bag. Defendant did not speak about the crime itself. When asked by Detective Bennett if he wanted to talk about the facts of the case, defendant refused and instead stated that he wanted to talk to an attorney before discussing the crime. Significantly, Detective Bennett and he discussed taking precautions for defendant's safety once in Stanislaus County and about extradition, but nothing about the crime itself. We therefore agree with the trial court's determination that defendant's May 10 statements did not taint his May 16 interview with Detective Bennett.

### 2. *The May 17 Statement to Dr. Trompetter.*

Defendant next argues that Dr. Trompetter's failure to readvise him of his *Miranda* rights following the brief interlude after Detective Bennett's questioning constitutes a *Miranda* violation.

### a. *Evidence from the Suppression Hearing.*

Following the completion of Detective Bennett's interview, Dr. Trompetter interviewed defendant. It was stipulated that Dr. Trompetter stated, "As Dan

[Bennett] said, I'm working with the DA's office, so the *Miranda* warning, I'm sure you got at some point in all this, it applies to me, too." The trial court ruled Dr. Trompetter's statement admissible.

b. *Discussion.*

■ An examination of a criminal defendant by a psychiatrist or psychologist retained by the prosecution constitutes a custodial interrogation for Fifth Amendment purposes and must be preceded by *Miranda* warnings. (*Estelle v. Smith* (1981) 451 U.S. 454, 466–469 [68 L.Ed.2d 359, 101 S.Ct. 1866].) ■ But where a subsequent interrogation is "reasonably contemporaneous[]" with the prior knowing and intelligent waiver, a readvisement of *Miranda* rights is unnecessary. (*People v. Braeseke* (1979) 25 Cal.3d 691, 701 [159 Cal.Rptr. 684, 602 P.2d 384], vacated and cause remanded (1980) 446 U.S. 932 [64 L.Ed.2d 784, 100 S.Ct. 2147], reaffd. (1980) 28 Cal.3d 86 [168 Cal.Rptr. 603, 618 P.2d 149].) Defendant was advised of his *Miranda* rights by Detective Bennett and made a full and voluntary waiver. *Miranda* does not require a second advisement when a new interviewer steps into the room.

In the present case, the record indicates that the gap between the end of Detective Bennett's interview and the start of Dr. Trompetter's interview was "a few minutes" and that Dr. Trompetter informed defendant that the *Miranda* warning applied to him. There was no error. (See *People v. Lewis* (2001) 26 Cal.4th 334, 387 [110 Cal.Rptr.2d 272, 28 P.3d 34]; *People v. Mickle* (1991) 54 Cal.3d 140, 170 [284 Cal.Rptr. 511, 814 P.2d 290].)

3. *Reinitiation of Questioning in the Squad Car.*

Defendant argues that the statements made in Modesto to Detective Bennett on May 16 and Dr. Trompetter on May 17 violated *Edwards, supra,* 451 U.S. at pages 484–485, because he was not provided an attorney following his unequivocal request for an attorney on May 10, and he did not reinitiate questioning prior to his May 16 and 17 statements. We conclude that no *Edwards* violation occurred because defendant himself initiated the ensuing dialogue leading to the May 16 and 17 statements.

a. *Evidence from the Suppression Hearing.*

On May 16, 1990, at 6:20 p.m., Detective Bennett and Deputy Viohl returned to Reno to transport defendant to the Stanislaus County Jail. Defendant and Detective Bennett sat in the backseat of the squad car while Viohl drove. Defendant was restrained with upper body chains and handcuffs. Bennett apologized to defendant for not arriving on May 15, but did not ask him if he still wanted to talk to him.

At some point during the trip, Bennett began reading a copy of the May 16, 1990 Modesto Bee newspaper. Defendant asked Bennett for a portion of the paper to read, and Bennett handed him the Metro section of the paper. Bennett explained that he had looked through the Metro section and had not noticed any articles pertaining to the case. But the front page of the section contained an article with the headline *Officers to Return Suspect*. Defendant took the paper and read it briefly before handing it back with the comment that there was an article about the case. The article stated that defendant would be arraigned for two counts of murder, that he was suspected of repeatedly stabbing Mary and April James on May 6 following a heated argument, and that an autopsy showed that April James had been sexually assaulted after she had been killed. Bennett stated that he was surprised because he had not seen the article in the lower right-hand column of the Metro section. Bennett testified that defendant did not appear to be angry when he handed back the newspaper, and that they had no discussion about the newspaper article.

After a quick stop, Bennett moved to the front seat of the car and Deputy Viohl moved to the back. Bennett stated that as the car approached the county line, defendant leaned towards the screen separating the front and back of the squad car and indicated that he was ready to talk to Bennett if he was still interested. Bennett responded that he would prefer to wait until they reached the sheriff's office. No further conversation ensued.

Defendant testified that Detective Bennett asked him soon after they entered the car in Nevada whether he wanted to talk to him about what had happened. Defendant replied that he did not. Regarding the newspaper incident, defendant stated that the newspaper was rolled up, as if it had just been delivered. Bennett unwrapped it, and told defendant that he had not read the paper yet and asked him if he wanted to read it. Defendant stated that he replied he "didn't care." Bennett flipped through the pages for "not more than a minute" before handing him the Metro section. Defendant handed the paper back to Bennett immediately after he had read the article. Twenty to 25 minutes later, defendant stated that he told Deputy Bennett he would talk to him.

On rebuttal, Detective Bennett asserted that he never asked defendant if defendant wanted to talk to him about the crimes from the time he picked defendant up in Reno until they arrived in Stanislaus County.

b. *Discussion.*

■ Once a suspect invokes the right to counsel, no further questioning may take place until an attorney is present, unless "the accused himself

initiates further communication, exchanges, or conversations with the police." (*Edwards, supra,* 451 U.S. at p. 485.) This establishes a bright-line rule that all questioning must cease after an accused requests counsel. (*Smith v. Illinois* (1984) 469 U.S. 91, 98 [83 L.Ed.2d 488, 105 S.Ct. 490].) "An accused 'initiates' " further communication, exchanges, or conversations of the requisite nature "when he speaks words or engages in conduct that can be 'fairly said to represent a desire' on his part 'to open up a more generalized discussion relating directly or indirectly to the investigation.' " (*People v. Mickey* (1991) 54 Cal.3d 612, 648 [286 Cal.Rptr. 801, 818 P.2d 84] (*Mickey*).)

▪ In reviewing defendant's *Edwards* claim, we apply a de novo standard of review to the trial court's denial of defendant's motion to suppress the May 16 statement to the degree that the trial court's underlying decision involved a measurement of the facts against the law. (See, e.g., *People v. Waidla, supra,* 22 Cal.4th at p. 730.) Regarding the trial court's subordinate determinations, we apply independent review to its determinations of law and look for substantial evidence of its determinations of fact. Mixed questions of fact and law we will resolve by the standards above according to whether they are predominantly legal or factual. (*People v. Louis* (1986) 42 Cal.3d 969, 985–987 [232 Cal.Rptr. 110, 728 P.2d 180].)

We first consider defendant's claims that Detective Bennett asked defendant to discuss the case during the squad car journey from Nevada to California. Detective Bennett asserts that this event did not take place. Defendant does not contest that when he reinitiated questioning with Detective Bennett later in the trip, Bennett asked defendant to wait to give his statement until they reached the police station.

In attempting to resolve this factual dispute, the trial court considered the import of Detective Bennett's request to wait until they arrived at the station before defendant gave his statement. The court stated, "It seems illogical that the officer would ask him to make a statement well before they got to Stanislaus County, and having asked him to do that, would then not be prepared to take a statement in the car. . . . [F]or that reason I have accepted the factual circumstances indicated by the detective and Deputy Viohl, and that the officer . . . did not ask him in the car . . . if he wanted to make a statement prior to talking to his attorney." This factual finding is supported by substantial evidence.

Defendant claims, however, that even assuming Detective Bennett never *asked* defendant if he wanted to speak to him, he nonetheless "initiated" contact with defendant in violation of *Edwards* by calculatedly showing him the Metro section of the Modesto Bee newspaper that contained an article

about the case, prompting defendant's desire to make a statement. The Attorney General responds that Detective Bennett's actions were inadvertent, as it was defendant himself who requested a section of the paper that Detective Bennett was reading, and Detective Bennett did not see the article about the case prior to giving the paper to defendant. In any event, the Attorney General argues the article was brief, merely contained public information, and did not constitute an attempt to initiate communication about the case.

We agree. In assessing defendant's *Edwards* claims, we inquire into whether, under the totality of the circumstances, there was "the requisite coercive activity by the state or its agents and the necessary causal connection between any such activity and the statements in question." (*Mickey, supra*, 54 Cal.3d at p. 651.) There was no coercive activity here. Nor did defendant respond to the newspaper article by offering Detective Bennett any incriminating information. Defendant simply noted that the paper included an article about the case. It was not until later in the trip, when they approached the county line, that defendant stated that he was ready to talk about the case, but even then Bennett requested that defendant wait until they arrive in Modesto. No further conversation about the case occurred. We therefore conclude the trial court properly denied defendant's motion to suppress the May 16 and 17 statements on the basis of purported violations of *Edwards*.

### C. *Jury Misconduct Issues.*

Five months after the jury reached its penalty phase verdict, defendant moved for a new trial on the ground of jury misconduct. After conducting an evidentiary hearing, the trial court denied the motion. Defendant contends the trial court abused its discretion in denying his new trial motion because misconduct by two jurors violated his Sixth Amendment right to be tried by an impartial jury, as well as the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution, and under article 1, section 16 of the California Constitution. As will be shown below, these claims lack merit.

#### 1. *Juror Robert R.*

On August 17, 1992, Juror Robert R. signed a declaration prepared by defense counsel detailing three instances during voir dire where he failed to disclose information indicating a potential bias. Robert R. provided this information to defense counsel during an interview with him:

(1) In June 1991, Robert R. had a criminal case pending for felony possession of 0.5 grams of methamphetamine. At the initial stages of the

case, Robert R. had agreed to become an informant to "work off" the case but had later changed his mind; (2) five years prior to defendant's trial, he was prosecuted in Lodi, California, but the charges were dropped after police discovered that the person they were seeking had the same name; (3) when he was around 12 years old, he had been the victim of a crime in which he was attacked and repeatedly stabbed.

### a. *Legal Principles.*

■ When misconduct involves the concealment of material information that may call into question the impartiality of the juror, we consider the actual bias test of *People v. Jackson* (1985) 168 Cal.App.3d 700, 705 [214 Cal.Rptr. 346], adopted by this court in *People v. McPeters* (1992) 2 Cal.4th 1148, 1175 [9 Cal.Rptr.2d 834, 832 P.2d 146]. "Although intentional concealment of material information by a potential juror may constitute implied bias justifying his or her disqualification or removal [citations], mere inadvertent or unintentional failures to disclose are not accorded the same effect. '[T]he proper test to be applied to unintentional "concealment" is whether the juror is sufficiently biased to constitute good cause for the court to find under Penal Code sections 1089 and [former] 1123 that he is unable to perform his duty.' (*People* v. *Jackson* (1985) 168 Cal.App.3d 700, 706 [214 Cal.Rptr. 346].) [¶] Whether a failure to disclose is intentional or unintentional and whether a juror is biased in this regard are matters within the discretion of the trial court. Except where bias is clearly apparent from the record, the trial judge is in the best position to assess the state of mind of a juror or potential juror on voir dire examination. [Citations.]" (*People v. McPeters, supra,* 2 Cal.4th at p. 1175.) Applying *McPeters* here, we determine whether any of Robert R.'s three failures to disclose are grounds for reversing the judgment.

### b. *Methamphetamine Arrest and Lodi Incident.*

Prior to voir dire, the jurors filled out a juror questionnaire. Question 15 asked whether the prospective juror had ever been involved in a criminal case as a victim, defendant, or a witness. Voir dire commenced on January 6, 1992. In testimony at the evidentiary hearing on the new trial motion, Robert R. stated that he did not reveal his June 1991 methamphetamine arrest because "I thought there was no charge. I thought it was dropped. I didn't think there was nothing." He stated that he confirmed with the district attorney's office that no charges were pending against him "several times." He added that he was not notified that charges were filed against him until after the jury had been dismissed. He further testified that he never thought about the incident at any time during the course of the trial.

Robert R. also testified that 10 years earlier he had been arrested in Lodi and spent the night in jail before discovering that the police had confused him

with another person with his name. He stated that he had to hire a private investigator to locate the real suspect before charges were finally dropped. Robert R. testified that he did not inform the court about this incident because the police "made a mistake and that was it."

In making its determination, the trial court acknowledged that it had not specifically asked Robert R. if he had previously been charged with an offense. The court accepted his testimony that he believed the methamphetamine case had "gone away," given that six months had passed from the date of arrest to the date voir dire commenced. As to both incidents, the trial court concluded there was no misconduct because the failure to disclose was inadvertent or unintentional, and there was no resulting bias. We find no abuse of discretion in this conclusion. (*People v. McPeters, supra,* 2 Cal.4th at p. 1175.)

### c. *The Stabbing Incident.*

Robert R., who was 34 years old at the time of the new trial hearing on August 27, 1992, admitted that 22 years before—when he was 12 or 13 years old—a group of five Latino youths had stabbed him about 15 times in the side, the head, and under the chin. He suffered broken ribs, and still has scars on his forehead and buttocks. During voir dire, the following exchange occurred: The court: "Have you ever been the victim of a crime? Robert R.: "No, not that—not that I can remember." The court: "How about an assault on your person, any kind of assault, battery on your person?" Robert R.: "No." The court: "As a youth or as an adult?" Robert R.: "No." The court: "You have never personally been the victim or the subject of any violence of any kind, is that correct?" Robert R.: "That's right."

At the evidentiary hearing, Robert R. stated that he did not disclose this information to the court "because I . . . just never thought about it, to be honest with you." He added that "It just never came to me or else I would have put it down. I mean I had no reason . . . not to put it down." He left question 19 of the juror questionnaire blank, where he was asked if he had ever been a crime victim. When asked why the answer was left blank, Robert R. stated, "Like I said, I, my mind just went—I never thought about it." Defense counsel then asked whether the incident had come back to him when he heard the victims in this case had been stabbed. He replied, "No, I never thought about it, to be honest with you. My focus was to be [unbiased]. I thought like, like we was supposed to be." He also stated: "[W]hen I was chosen as a juror, I mean [it's] like anything else I do, I try to do to the best of my ability, and I think I, my main thing was trying to listen . . . to the testimony, and listen to the Court's instructions and to everybody in general here, not nothing to do with nothing outside." Robert R. told defense counsel

that the only reason he told him of these incidents after the trial is because the juror thought "there was nothing, there would never be nothing else said about it."

The trial court reviewed several juror declarations, and at an evidentiary hearing questioned Robert R. and submitted him to cross-examination by defense counsel. The court concluded that Robert R. did not intentionally fail to disclose the 20-year-old stabbing incident. First, the court found that Robert R. was credible: "[Robert R.] appeared to be frank with the Court and counsel. [He] [d]idn't seem to have anything to hide. [He] [d]idn't even seem to be too uncomfortable at being here. [He] didn't hesitate in his responses. [He] [d]idn't seem to contradict himself. . . . [¶] [I]t appears to me that [Robert R.] has been forthright with the Court, did not exhibit the often-seen symptoms of a person caught up in something, making desperate attempts to extricate themselves, and otherwise giving the symptoms of discomfort that often accompany a person who is not or may not be telling the truth." The court ultimately was persuaded as to Robert R.'s inadvertence because "Why would he mention it to [defense counsel] two months later? If you are going to hide this from the Court and counsel in January, why not do so in June? Why unload it on a one-to-one, six months later?" The court concluded that Robert R. "was a fair and impartial juror in this case."

██ Notwithstanding this determination, juror misconduct may still be found where bias is clearly apparent from the record. (*People v. McPeters, supra*, 2 Cal.4th at p. 1175.) To the degree that the trial judge concludes that juror concealment, even when not intentional, reflects a state of mind that "would prevent a person from acting impartially," then consistent with the standard in *Jackson* and *McPeters* a new trial must be granted. (*People v. Jackson, supra*, 168 Cal.App.3d 700; cf. *People v. Diaz* (1984) 152 Cal.App.3d 926, 934–936 [200 Cal.Rptr. 77] (*Diaz*).)

We defer to the trial court's judgment on Robert R.'s credibility. The court noted that Robert R. cooperated fully with defense investigators, and ultimately concluded that Robert R. was a credible witness at the evidentiary hearing and "a fair and impartial juror in this case." On this basis we conclude that it was not an abuse of discretion for the trial court to determine that no such bias was apparent and no misconduct occurred. (See *People v. McPeters, supra*, 2 Cal.4th at p. 1175.)

In so concluding, we distinguish two cases with a factual background similar to this one. In *Diaz, supra*, 152 Cal.App.3d 926, a case involving a defendant charged with assault with a deadly weapon (knife), a juror concealed during voir dire that she had been assaulted at knifepoint during an attempted rape 13 years before, notwithstanding having been specifically asked. (*Id.* at p. 931.) During the last day of the four-day trial, and after the

prosecution had rested its case, the juror revealed to court personnel her prior knife attack. She stated initially that "she did not remember being specifically asked whether she had been a victim of any similar type of incident involving a knife," but later stated that "it never occurred to her the assault on her was an assault with a deadly weapon." (*Ibid.*) Both the bailiff and clerk testified that the juror seemed to be "prejudiced as to violent crimes." (*Ibid.*) As the trial had not yet ended and no alternate jurors had been selected, the trial court asked defense counsel whether he was willing to proceed with 11 jurors. Defense counsel refused to stipulate, and the trial court denied the motion to dismiss the juror. The defendant was convicted of assault with a deadly weapon. (*Id.* at p. 930.)

The Court of Appeal reversed, concluding that the trial court erred in refusing to discharge the juror pursuant to former section 1123, now Code of Civil Procedure section 233. (*Diaz, supra,* 152 Cal.App.3d at p. 932.) The court found that "when a juror has been victimized by the same type of crime," the "probability of bias" is substantial and often unconscious and thus unlikely to be admitted during an evidentiary hearing. (*Id.* at p. 939.) When this occurs, the court reasoned that bias "should be implied as a matter of law" (*ibid.*), rebuttable " 'by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct.' " (*Id.* at p. 934.) The court concluded that the prosecutor failed to rebut the presumption of prejudice. (*Id.* at pp. 936–937.)

Assuming *Diaz* is correct that a rebuttable presumption of prejudice arises when jurors fail to disclose their material prior history as crime victims, we conclude that the presumption was rebutted in the present case. In contrast to the juror in *Diaz,* Robert R. was consistent in his explanation that he "never thought about" the stabbing during voir dire or trial. The trial court found him credible based on its specific observations of his demeanor and on the fact that it made no sense for him to disclose this information voluntarily to defense counsel six months after the verdict if he intentionally failed to disclose it. Nor was there in the present case any evidence affirmatively indicating juror bias, as there was in *Diaz.* Thus, unlike in *Diaz,* any presumption of prejudice was surmounted by substantial evidence that Robert R. was in fact an unbiased juror.

In *Dyer v. Calderon* (9th Cir. 1998) 151 F.3d 970, 973–983, the Ninth Circuit found that a juror's misconduct on voir dire—the concealment of the fact that her brother had been murdered—required application of the doctrine of implied bias and reversed a murder judgment without resort to a harmless error analysis. The Ninth Circuit held that the trial court erred in accepting,

without further inquiry, the juror's explanation that the shooting was an accident, given that the court file, which was in the court's possession at the time it made its ruling, indicated that the victim was pistol whipped four times and then shot in the back of the head.

Unlike the cursory examination performed by the trial court in *Dyer*, the trial court before us conducted an extensive evidentiary hearing, considering juror declarations, additional evidence, and live testimony from jurors. We are satisfied on this well-developed evidentiary record the trial court did not abuse its discretion in concluding that Robert R.'s failure to disclose the stabbing incident was not deliberate and that he was not biased. (Cf. *Dyer v. Calderon*, *supra*, 151 F.3d at pp. 976–978.)

### 2. *Juror Renee P.*

As to Juror Renee P., defendant alleges two theories of misconduct: (1) that Renee P., a registered nurse, improperly asserted her expertise during deliberations, and (2) that she improperly consulted outside sources. Defendant requested that the court conduct an evidentiary hearing, and in support of the motion, he submitted statements from four jurors:

Juror Robert R. declared that a major point of dispute during deliberations was whether April James was dead at the time of the rape. Renee P. disclosed to the jury that she was a nurse, and she explained a number of the medical issues relating to blood pressure and circulation. "She also explained shunting, and the manner in which the body would have directed the blood after the stab wounds were inflicted. Her explanations were helpful in determining whether the child was dead before she was sexually assaulted."

Juror Randall G. similarly declared that whether April James was dead at the time of the sexual assault was a major issue during the deliberations, that Renee P. was an emergency room nurse familiar with stab wounds, that she explained blood pressure, blood circulation in the pelvic area, and shunting, and "provided clarification of [the pathologist's] testimony."

Juror Cecile Q. told defense investigator Jerry Kubena that Renee P. had "gone home and read a lot of books and brought the facts back to the jury." While Cecile Q. initially wavered on whether April James was alive when she was raped, she changed her mind after further explanation from Renee P. on how long death would come after the stab wounds, and how much blood would flow as a result of the wounds.

Juror Pam V. told Kubena that Renee P. had been a great help during deliberations by explaining medical terms and definitions. Renee P. explained

to the jury the pumping of the heart, the circulatory system, and some of the medical evidence given during trial.

A court may hold an evidentiary hearing when jury misconduct is alleged in a new trial motion, but the court may also, in its discretion, conclude that a hearing is not necessary "to resolve material, disputed issues of fact." (*People v. Hedgecock* (1990) 51 Cal.3d 395, 415 [272 Cal.Rptr. 803, 795 P.2d 1260].)

Based on the proffered juror statements, the trial court denied defendant's motion to conduct an evidentiary hearing on the issue of whether Renee P. improperly asserted her expertise during deliberations. However, it did conduct an evidentiary hearing on the issue of whether Renee P. had consulted and introduced outside sources during deliberations, and took testimony from Juror Cecil Q. on this issue. It was stipulated that Renee P. would categorically deny consulting outside medical sources and bringing such information back to the jury. After considering the evidence adduced at the hearing, the trial court ruled that Renee P. had not consulted nor introduced outside sources and denied defendant's motion for a new trial. We will consider in turn defendant's claims that Renee P. rendered an improper opinion during deliberations and that she improperly introduced outside sources.

### a. *Improper Opinion.*

" 'It is not improper for a juror, regardless of his or her educational or employment background, to express an opinion on a technical subject, so long as the opinion is based on the evidence at trial. Jurors' views of the evidence, moreover, are necessarily informed by their life experiences, including their education and professional work. A juror, however, should not discuss an opinion explicitly based on specialized information obtained from outside sources. Such injection of external information in the form of a juror's own claim to expertise or specialized knowledge of an issue is misconduct.' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1265 [120 Cal.Rptr.2d 432, 47 P.3d 225] (*Steele*), quoting *In re Malone* (1996) 12 Cal.4th 935, 963 [50 Cal.Rptr.2d 281, 911 P.2d 468].)

In *Steele*, the defendant introduced extensive evidence regarding his military training and Vietnam experience and its effect, if any, on a brain electrical activity mapping (BEAM) test. He alleged that four jurors, two with military and Vietnam experience, and two with medical experience, committed misconduct by offering their expertise to other jurors. It was alleged that two jurors " 'with medical experience . . . told the [other jurors] that the criteria that the Doctor's [*sic*] used to establish the validity of the B.E.A.M. Test' was 'inadequate' based on 'what they have learned in their own

experience in the medical field.' " (*Steele, supra,* 27 Cal.4th at p. 1260.) Another juror stated that this input " 'helped me because I have no experience when it comes to that type of thing.' " (*Ibid.*) The trial court declined to hold an evidentiary hearing and denied defendant's motion for a new trial.

■ We agreed and first noted: "To the extent the declarations stated what effect these jurors had on the deliberations, the statements are inadmissible under Evidence Code section 1150, subdivision (a)," which "prohibits evidence showing the *effect* that statements or conduct [have] 'upon a juror either in influencing him to assent or to dissent from the verdict.' " (*Steele, supra,* 27 Cal.4th at p. 1265.) We continued: "A juror may not express opinions based on asserted personal expertise that is different from or contrary to the law as the trial court stated it or to the evidence, but if we allow jurors with specialized knowledge to sit on a jury, and we do, we must allow those jurors to use their experience in evaluating and interpreting that evidence. Moreover, during the give and take of deliberations, it is virtually impossible to divorce completely one's background from one's analysis of the evidence. We cannot demand that jurors, especially lay jurors not versed in the subtle distinctions that attorneys draw, never refer to their background during deliberations. . . . [¶] . . . In this case, the declarations do not so clearly show that the jurors crossed the line into misconduct as to have required the court to conduct an evidentiary hearing." (*Id.* at p. 1266.)

Similarly, in the present case, the evidence presented in support of defendant's motion for a new trial does not show that Renee P. offered the jurors any basis for deciding the case other than the evidence and testimony presented at trial. No declaration suggests that she made any assertion inconsistent with the properly admitted evidence and testimony. Indeed, the remarks attributed to her in her declaration are consistent with the trial testimony of the pathologist, who expounded at length on the concept of blood flow, circulation, and the meaning of "shunting." The trial court did not abuse its discretion in ruling that Renee P.'s explanation of blood evidence was not misconduct.

### b. *Outside Sources.*

■ "It is improper for a juror to receive information outside of court about the pending case, and to discuss the case with nonjurors." (*In re Carpenter* (1995) 9 Cal.4th 634, 647 [38 Cal.Rptr.2d 665, 889 P.2d 985].) When such misconduct is determined to be prejudicial, reversal is required. (*Id.* at pp. 650–651.)

Cecile Q., the sole juror called to testify at the hearing, was ambiguous as to whether Juror Renee P. had consulted outside sources. She first stated that

Renee P. had done research on the point of whether April had been alive at the time of the rape. "She explained what . . . research she had done, and we listened . . . . Then we discussed it." But she conceded that she could not recall when Renee P. had made this statement or when she had done the research. She also hedged her statement: "Maybe I just, we just assumed that it was a research thing. In other words, she had, she had access to the books, or . . . the medical library. Maybe. I don't know."

The defense attorney also questioned Cecile Q., ultimately receiving responses that indicated there was no consultation of outside materials. She stated, "I don't remember anybody saying exactly if they were going to a library or if it was mentioned and if they really did." She also equivocated, "I'm not really sure, a hundred percent sure. I know that the subject was brought up, but whether they really did it, I don't know." The defense attorney again asked who brought up the subject of consulting other books, to which she stated that Renee P. did discuss it, but did not mention that she had consulted books at home or at a library. Further, she stated that at no point did jurors return from a recess with additional information they had not had previously.

The trial court ruled that the defense had not established that outside sources were brought into the room. It therefore reaffirmed its earlier ruling that no misconduct occurred. The trial court did not abuse its discretion in so ruling. (*People v. McPeters, supra,* 2 Cal.4th at p. 1175.)

D. *The Witness-killing Special Circumstance.*

 Defendant contends that the trial court violated California and federal due process law by denying his section 995 motion to dismiss the witness-killing special circumstance[6] in light of the magistrate's decision at the preliminary hearing to strike the special circumstance allegation pursuant to section 871. Section 871 allows the magistrate to dismiss the complaint, or a portion of the complaint, when "there is not sufficient cause to believe the defendant guilty" of the charged offense. We disagree that the trial court committed any such violation.

---

[6] Section 190.2, subdivision (a) provides: "The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if . . . : [¶] . . . [¶] (10) The victim was a witness to a crime who was intentionally killed for the purpose of preventing his or her testimony in any criminal or juvenile proceeding, and the killing was not committed during the commission or attempted commission, of the crime to which he or she was a witness."

1. *Background.*

The criminal complaint alleged that defendant's murder of April James constituted a special circumstance under Penal Code section 190.2, subdivision (a)(10) because the victim "was a witness to a crime who was intentionally killed for the purpose of preventing her testimony in a criminal proceeding but that said killing was not committed during the commission and attempted commission of the crime to which she was a witness . . . ." At the preliminary hearing, the magistrate questioned Detective Bennett to determine whether there was sufficient cause to hold defendant for the witness-killing special circumstance. Detective Bennett testified that defendant stated "that after he finished stabbing Mary James . . . he got up and walked into the bathroom of the residence, still having the same knife in his hand. [¶] As he stood in front of the mirror looking in the mirror, he noticed April James standing behind him. He could see her in the reflection in the mirror. [¶] He said that he turned around, grabbed her by the left shoulder, top of her shoulder area with his hand—with his right hand, stabbed her in the chest."

When asked if defendant told him why he had killed April, Bennett responded: "He said he really wasn't sure. He thought a lot about it. I asked him if it was because she had possibly seen him kill Mary James. He said he wasn't aware of her seeing him do that, but that that was probably the case . . . [b]ut he couldn't specifically remember."

The court asked the prosecution to develop Bennett's testimony on this matter, as he was getting "mixed signals." The prosecutor continued: "And he didn't specifically remember killing April because she was a witness, but said that's probably why he did it." Bennett replied, "That's correct." The prosecutor continued: "He didn't give you any other reason for killing April James, did he?" Bennett replied, "No, he did not."

The prosecutor then asked Bennett whether defendant had told him of his motive for killing April. Detective Bennett replied, "Well, first I asked him if he was afraid she might have seen what had happened to Mary, that she might tell. His response was, 'I don't know. That could have been the reason why. Yeah.' " Bennett conceded that he had been the one who had suggested that perhaps defendant had killed April because she "might tell," and that defendant had simply agreed that this may have been the reason.

The magistrate then stated that he had "a question, a very serious question" regarding the witness-killing special-circumstance allegation. "There is evidence somewhat flimsy [*sic*] to sustain that, but based on everything I have heard, I do have a serious question as to whether or not there is ample

evidence on that allegation." In response, the prosecutor pointed to defendant's statement that he turned to stab April after seeing her reflection in the mirror, allowing the inference that defendant "felt that she may have seen what he had done to Mary James, the young girl's aunt. And if that's the case, of course, that would be a murder of a witness." The prosecutor acknowledged that the special circumstance allegation would not be established if April's murder occurred "at the same time in the same course of conduct" as Mary's murder, and that the "evidence is not overwhelming as to that particular special circumstance, but there is some evidence that should probably go to a trier of fact to decide." Defense counsel responded that defendant had made a statement that he "didn't know whether [April] was a witness or not . . . [and] this was a continuation of" the murder of his wife.

The magistrate noted, "There [are] a couple of inferences here that the court might make, whether it be reasonable or not. I can't answer at this point. Because it is—it's of some concern to the court. One, that it was a continuous act, the killing of both persons; another—another inference would be that he killed her for the purposes of attempted rape or rape; three, that he realized she would have been a witness, even if she hadn't seen anything as of that point. She eventually, had she been permitted, had she been left alone would have discovered what had happened. And while not an eyewitness, certainly her evidence—her testimony would have been circumstantial evidence as to what had happened." The magistrate then found the allegation not true[7] and struck it.

Prior to trial, the prosecution filed the information in superior court again alleging the witness-killing special circumstance. (§ 739.) Defendant made a section 995 motion to dismiss the allegation, which was denied by the trial court.

### 2. *Standard of Review.*

 A magistrate may strike a special circumstance allegation if he or she finds the evidence presented at the preliminary hearing does not provide "sufficient cause to believe that the defendant is guilty" of the charged allegation. (§ 872, subd. (a); see also *Ramos v. Superior Court* (1982) 32 Cal.3d 26, 34 [184 Cal.Rptr. 622, 648 P.2d 589].) This does not preclude the prosecutor from later filing an information charging the same matter omitted by the magistrate from the order of commitment. (§ 739; *People v. Slaughter*

---

[7] The parties disagree whether the magistrate's "not true" ruling constituted a finding of fact or ruling of law. Because the magistrate's language on the witness-killing special circumstance was consistent with his language in ruling on other counts where sufficient cause was found to hold defendant over for trial, we interpret the magistrate's ruling on the witness-killing special circumstance as a ruling of law of insufficient cause to hold defendant over for trial.

(1984) 35 Cal.3d 629, 633 [200 Cal.Rptr. 448, 677 P.2d 854].)[8] Where the prosecution later refiles such allegation in the information before the superior court, defendant may move to have the allegation set aside if "the defendant had been committed without reasonable or probable cause."[9] (See *Ghent v. Superior Court* (1979) 90 Cal.App.3d 944, 955 [153 Cal.Rptr. 720]; *People v. Firestine* (1968) 268 Cal.App.2d 533, 535 [74 Cal.Rptr. 168].) The term "sufficient cause" in section 872, subdivision (a) " 'is generally equivalent to "reasonable and probable cause" ' " in section 995, subdivision (a)(2)(B), i.e., " 'such a state of facts as would lead a man of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused.' " (*People v. Williams* (1988) 44 Cal.3d 883, 924 [245 Cal.Rptr. 336, 751 P.2d 395].)

▇ When we review a section 995 motion, we "disregard[] the ruling of the superior court and directly review[] the determination of the magistrate." (*People v. Laiwa* (1983) 34 Cal.3d 711, 718 [195 Cal.Rptr. 503, 669 P.2d 1278]; see also *People v. Superior Court (Lujan)* (1999) 73 Cal.App.4th 1123, 1127 [87 Cal.Rptr.2d 320].) We conduct an independent review of the evidence, but will not substitute our judgment for that of the magistrate as to the credibility or weight of the evidence. (*People v. Hall* (1971) 3 Cal.3d 992, 996 [92 Cal.Rptr. 304, 479 P.2d 664].) We will not set aside an information "if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it." (*Ibid.*)

### 3. *Discussion.*

▇ The magistrate determined that the evidence presented at the preliminary hearing did not provide sufficient cause to support the witness-killing special-circumstance allegation. There are three elements of the witness-killing special circumstance: "(1) a victim who has witnessed a crime prior to, and separate from, the killing; (2) the killing was intentional; and (3) the purpose of the killing was to prevent the victim from testifying about the crime he or she had witnessed." (*People v. Stanley* (1995) 10 Cal.4th 764, 801 [42 Cal.Rptr.2d 543, 897 P.2d 481], quoting *People v. Garrison* (1989) 47 Cal.3d 746, 792 [254 Cal.Rptr. 257, 765 P.2d 419].)

---

[8] Section 739 provides that the prosecutor may file in the superior court an information charging the defendant with the "offenses named in the order of commitment or any offense or offenses shown by the evidence taken before the magistrate to have been committed." So long as the additional offense was supported by the evidence taken before magistrate, it may be included in the information—even if the magistrate did not see fit herself to include such offense. (*Ramos v. Superior Court, supra,* 32 Cal.3d at pp. 34–36; *People v. Slaughter, supra,* 35 Cal.3d at p. 633.)

[9] Section 995, subdivision (a) provides: "the indictment or information shall be set aside by the court . . . : [¶] . . . [¶] [(2)(B)] [where] the defendant had been committed without reasonable or probable cause."

■ As to the first element, a crime is not " 'prior to, and separate from,' the killing" if it is part of " 'one continuous transaction' or 'the same continuous criminal transaction.' " (*People v. Benson* (1990) 52 Cal.3d 754, 785 [276 Cal.Rptr. 827, 802 P.2d 330] (*Benson*); accord, *People v. Jenkins* (2000) 22 Cal.4th 900, 1018 [95 Cal.Rptr.2d 377, 997 P.2d 1044] (*Jenkins*); *People v. Silva* (1988) 45 Cal.3d 604, 631 [247 Cal.Rptr. 573, 754 P.2d 1070] (*Silva*); *People v. Dominick* (1986) 182 Cal.App.3d 1174, 1200–1202 [227 Cal.Rptr. 849] (*Dominick*).) In *Silva*, the defendants kidnapped and robbed a couple, Kevin and Laura. They killed Kevin, repeatedly raped Laura, and then decided that Laura "would have to be killed because she would know too much." (*Silva, supra*, 45 Cal.3d at p. 631.) We reversed the witness-killing special-circumstance allegation, because the kidnapping, robbery, and murder were "part of the same continuous criminal transaction." (*Ibid.*) In *Benson*, defendant killed a mother who lived with her three children, killed her son, molested her two young daughters for two days, and ultimately killed them as well " 'to protect [the defendant's] freedom.' " (*Benson, supra*, 52 Cal.3d at pp. 767–768.) As in *Silva*, we found that the murder of the mother and the murder of the daughters "were integral parts of a single continuous criminal transaction against the entire family." (*Id.* at p. 785.)

We affirmed the witness-killing special circumstance in *Jenkins*, where defendant was on trial for robbery, and killed the investigating police officer to prevent his testimony at trial. (*Jenkins, supra*, 22 Cal.4th at pp. 932, 1018.) Our Court of Appeal also affirmed the application of the special circumstance in *Dominick*, in which the defendant killed a teenage boy, Danny, to prevent him from testifying as a witness in a criminal proceeding based on the sexual assault of the boy's female friend, Kim. (*Dominick, supra*, 182 Cal.App.3d at p. 1202.) Danny was not himself "sexually assaulted nor directly part of those activities" in which the sexual assault on Kim took place, but Danny did "circumstantially" witness those crimes and sat briefly with Kim in the station wagon following her assault. (*Id.* at p. 1202.) The court concluded that Danny's killing constituted a separate criminal transaction from the sexual assault on Kim. (*Id.* at pp. 1201–1202.)

■ These cases illustrate that to establish one continuous criminal transaction, the time lag between the first and second killing does not matter so much as whether the defendant shows a common criminal intent toward all the victims upon the initiation of the first criminal act. When that criminal intent toward all victims is present, the criminal transaction does not conclude until the killing of the final victim. In *Silva*, there was insufficient evidence to support the witness-killing special circumstance because the defendant's actions in kidnapping Kevin and Laura were part of the same transaction that resulted in their deaths. (*Silva, supra*, 45 Cal.3d at p. 631.) The defendant's criminal intent extended to both Kevin and Laura upon their initial kidnapping, and that transaction culminated in their murder. (*Ibid.*) In *Benson*,

though the defendant killed the mother two days prior to her two daughters, he " 'went out there with the intention of doing something to the kids.' " (*Benson, supra,* 52 Cal.3d at p. 767.) The defendant's criminal intent included all of his victims upon the initiation of his first criminal act against the mother. (*Ibid.*) On the other hand, in *Jenkins,* there was no common criminal intent. The murder victim was killed only because he was the investigating officer of the robbery with which the defendant was charged. The murder victim had no other connection to the robbery or its victim. (*Jenkins, supra,* 22 Cal.4th at pp. 931–933.) In *Dominick,* notwithstanding the brief time lapse between Kim's sexual assault and Danny's murder, the defendant initially intended to sexually assault and rape Kim, and then decided to murder Danny in order to eliminate him as a witness. (*Dominick, supra,* 182 Cal.App.3d at pp. 1183–1185, 1202.)

■ In the present case, there is substantial evidence to support the conclusion that more than one criminal transaction took place. While the time period between the deaths of Mary and April was short, no evidence was offered by defendant that he possessed a common criminal intent toward both Mary and April prior to killing Mary with the knife. Rather, the evidence supports the conclusion that defendant did not consider any criminal action toward April until the moment April came across defendant covered in Mary's blood in the bathroom. Once defendant encountered April in the bathroom, and then formed the intent to kill her, a second criminal transaction began.

■ Both sides concede the presence of the second element of the witness-killing special circumstance, that the killing was intentional, but contest the third element, that the purpose of the killing was to prevent the victim from testifying about the crime he or she had witnessed. Although it is not necessary to show that a criminal proceeding against defendant was initiated or pending at the time of the witness's death, the absence of such a proceeding deprives the prosecution of the benefit of the inference that defendant killed for the proscribed purpose. (*People v. Weidert* (1985) 39 Cal.3d 836, 854 [218 Cal.Rptr. 57, 705 P.2d 380].) A defendant also may be motivated by multiple purposes in killing the victim; the witness-killing special circumstance applies even when only one of those motives was to prevent the witness's testimony. (*Jenkins, supra,* 22 Cal.4th at p. 1018, citing *People v. Stanley, supra,* 10 Cal.4th at pp. 800–801.) Finally, the victim does not need to have been an "eyewitness" in order for the special circumstance to apply. (*Jenkins, supra,* 22 Cal.4th at p. 1018.)

There are two types of evidence regarding defendant's motivation that, taken in combination, support the conclusion he killed April to silence her as a witness. First, there was the statement defendant made during his confession to Detective Bennett. In response to Detective Bennett's suggestion that

April was killed to prevent her from telling, defendant replied, "I don't know. That could have been the reason why. Yeah." While defendant later went on to state that he did not know why he had killed April, the earlier statement leaves open the possibility that one of defendant's motives for killing April could have been to keep her from reporting the murder or testifying.

Second, there was circumstantial evidence that defendant killed April to prevent her subsequent testimony. April caught defendant in the bathroom in a very compromising state, carrying a knife and soaked in Mary's blood. Defendant admitted that he saw April's reflection in the bathroom mirror prior to turning and killing her. In *People v. Garrison, supra,* 47 Cal.3d at page 792, we found the evidence insufficient to support a witness-killing special circumstance where the "witness" had not witnessed anything at all, rejecting the prosecution's claim that the victim had been killed to keep her from becoming a witness. The same cannot be said for April; whether or not she saw or heard defendant actually kill Mary, or knew that Mary's dead body lay in the adjacent room, she certainly witnessed defendant covered in blood in the immediate aftermath of the murder. The crucial factor here is defendant's subjective belief that April witnessed the killing; we need not be certain April actually heard or saw Mary's murder, or was aware prior to that point that Mary was dead. (*Jenkins, supra,* 22 Cal.4th at p. 1018.) There is substantial evidence to support an inference by the jury that the killing was motivated by defendant's desire to silence April as a witness either to the murder itself, or its aftermath. (*Ibid.*) We therefore conclude that the evidence is sufficient to support the reinstatement of the special circumstance allegation, notwithstanding the magistrate's earlier dismissal.

Defendant also claims that there was not substantial evidence to support the jury's finding of the witness-killing special circumstance. The jury heard the evidence recounted above, and no additional evidence that would tend to disprove the witness-killing special circumstance. We therefore conclude that the jury's witness-killing special-circumstance finding is supported by substantial evidence.

E. *Sufficiency of Evidence of Premeditated Murder.*

The jury found defendant guilty of the willful, deliberate, and premeditated murder of April James. Defendant claims that the evidence was insufficient to support his conviction for the first degree murder of April James, thus violating his federal due process rights guaranteed by the Fourteenth Amendment to the United States Constitution. We disagree.

To evaluate this claim, we must "examine the entire record in the light most favorable to the judgment to determine whether it contains

substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." (*People v. Lewis* (2001) 25 Cal.4th 610, 642 [106 Cal.Rptr.2d 629, 22 P.3d 392]; see *People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) ▮ Three categories of evidence are helpful to sustain a finding of premeditation and deliberation in a murder case: (1) planning activity; (2) motive; and (3) manner of killing. (*People v. Anderson* (1968) 70 Cal.2d 15, 26–27 [73 Cal.Rptr. 550, 447 P.2d 942]; see also *People v. Welch* (1999) 20 Cal.4th 701, 758 [85 Cal.Rptr.2d 203, 976 P.2d 754].) Evidence of each of the *Anderson* factors need not be present in order to support a finding of deliberation, but planning, or motive in conjunction either with planning or with manner of killing, must be present to support such a finding. (*People v. Hawkins* (1995) 10 Cal.4th 920, 956–957 [42 Cal.Rptr.2d 636, 897 P.2d 574], overruled on other grounds by *People v. Blakeley* (2000) 23 Cal.4th 82, 89–91 [96 Cal.Rptr.2d 451, 999 P.2d 675].) A judgment will not be reversed so long as there is substantial evidence to support a rational trier of fact's conclusion that the murder committed was premeditated and deliberate. (*People v. Perez* (1992) 2 Cal.4th 1117, 1126–1127 [9 Cal.Rptr.2d 577, 831 P.2d 1159]; *People v. Sanchez* (1864) 24 Cal. 17, 30 (*Sanchez*).)

Defendant stated that he saw April's reflection in the bathroom mirror before turning around and stabbing her. The act of planning—involving deliberation and premeditation—requires nothing more than a "successive thought[] of the mind." (*Sanchez, supra,* 24 Cal. at p. 30; see also *People v. Jones* (1963) 215 Cal.App.2d 341, 346 [30 Cal.Rptr. 280].) This brief period between seeing April's reflection and stabbing her is adequate for defendant to have reached the deliberate and premeditated decision to kill April. (See *People v. Mayfield* (1997) 14 Cal.4th 668, 767 [60 Cal.Rptr.2d 1, 928 P.2d 485] [" '[t]houghts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly' "].) Evidence also was offered at trial as to motive and manner of killing. As discussed in the preceding section, the prosecution credibly advanced the theory that defendant killed April because she was a witness—she saw him in the bathroom covered in Mary's blood and carrying a knife as he attempted to clean up, and defendant saw in the bathroom mirror that April had seen him at this critical juncture. Defendant's motive to kill April credibly could have been that he had been caught, and that it was necessary to kill the young girl to prevent her from informing the police and ultimately testifying as a witness against him. At that point April was the lone witness to his crime against Mary, and her killing served to facilitate his escape.

The jury also fairly could have concluded that defendant was intent upon killing April due to the sheer number of wounds on April's body, many of which individually would have been fatal. This evidence as to the manner of

killing supports a finding of deliberation. Even if April's wounds were only suggestive of rage, an inference of premeditation is not precluded. (*People v. Thomas* (1992) 2 Cal.4th 489, 518 [7 Cal.Rptr.2d 199, 828 P.2d 101].)

In short, considerable evidence was offered at trial that defendant murdered April with premeditation and deliberation because she would give evidence against him as to Mary's murder. Taken in the light most favorable to the judgment, we conclude that substantial evidence supports a reasonable trier of fact's determination of premeditation and deliberation beyond a reasonable doubt.

### F. Sufficiency of Evidence Victim Was Alive When Raped.

Defendant next asserts that substantial evidence was not offered at trial that April James was raped before death (§ 261), in violation of the due process clause of the Fifth and Fourteenth Amendments to the United States Constitution. He contends that the only conclusion that can be drawn from the evidence is that he formed the intent to rape April only after he killed her, and that she was dead when he penetrated her. Accordingly, defendant asserts that we must reverse his convictions for rape and forcibly committing a lewd act on a child under 14 years of age, as well as the true findings on the two special circumstance allegations based on those crimes: killing in the commission of the rape of April James (§§ 190.2, subd. (a)(17), 261, subd. (a)(2)); and killing in the commission of lewd and lascivious conduct on a child under 14, April James. (§§ 190.2, subd. (a)(17), 288, subd. (b)(1).) Reviewing the whole record in the light most favorable to the judgment below, we reject this claim. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125 [12 Cal.Rptr.3d 592, 88 P.3d 498]; *People v. Mayfield, supra,* 14 Cal.4th at p. 767.)

#### 1. Evidence Offered at Trial.

Four types of evidence were introduced at trial on the timing of April's death: (1) defendant's statements; (2) the condition of April's body at the crime scene; (3) the expert testimony of Dr. William Ernoehazy, who testified for the prosecution; and (4) the expert testimony of Dr. Thomas Rogers, who testified for the defense.

Detective Bennett confronted defendant with evidence that April had been raped, to which defendant responded, "I didn't realize this happened. . . . When I was kneeling there next to her[,] . . . I think it happened right . . . ." Detective Bennett asked, "She was already dead then, right?" Defendant responded, "Yeah." Defendant claimed that after April was dead he had inserted his penis into her vagina, but quickly stopped and did not ejaculate.

April's body was found clothed only in a blood-soaked sweatshirt; her panties—stained by blood and urine—had been removed and were later found in the dirty clothes hamper. The body had a number of stab wounds to the chest and back, and a contusion on the forehead. A defensive wound was found on April's left wrist. While the stab wounds in her chest corresponded to tears in the sweatshirt, the stab wounds in her back did not so correspond. There also was an extensive tear of one to one and one-half inches on the perineum between the vagina and anus, with little visible hemorrhaging from the torn tissue. Penetration had been made by an erect penis or large blunt object. The blood pattern on the body indicated that the sweatshirt had been pulled fairly high up on the chest at the time the wounds were inflicted.

Dr. Ernoehazy acknowledged that there was no hemorrhaging in the soft tissue adjacent to the perineal tear, which suggested that April was dead when she was penetrated. Nonetheless, he opined that she was alive at the time she was raped based on the following evidence: April had been stabbed several times in the chest and her ascending and descending aorta were perforated, which would have "seriously interfered with" circulation to "the lower portion of the body." But as no wound penetrated the heart itself, April's heart would have continued to beat for several minutes and sustained full brain function, even though blood pressure would drop significantly and respiration would be shallow. Because there was a lack of drying to the skin around the perineal tear, it indicated a predeath injury that occurred within a short time of the stabbing.

Dr. Rogers, a forensic medical expert, based his opinion on an analysis of Dr. Ernoehazy's autopsy report. Rogers indicated that had April been alive at the time the perineal injury was created, there would have been a hemorrhage of the surrounding tissue. Reduced blood pressure may have made this hemorrhage difficult to see without the aid of a microscope, but no hemorrhage at all would indicate that April was not alive at the time of the perineal injury.

2. *Discussion.*

■ Certainly, rape requires a live victim, and the intent to have sexual intercourse with a dead body qualifies as neither rape nor attempted rape. (*People v. Kelly* (1992) 1 Cal.4th 495, 524 [3 Cal.Rptr.2d 677, 822 P.2d 385].) ■ Intent to rape may "be inferred from all of the facts and circumstances disclosed by the evidence" (*People v. Matson* (1974) 13 Cal.3d 35, 40–42 [117 Cal.Rptr. 664, 528 P.2d 752]; see § 21), and is proven by "acts, conduct and circumstances connected with the offense." (*People v. Van Wyke* (1949) 91 Cal.App.2d 839, 843 [206 P.2d 53].) ■ Where the defendant does attempt to rape or sodomize a victim, "reasonably

or mistakenly believing that the victim is alive, the perpetrator is guilty of having attempted the underlying felony." (*People v. Hart* (1999) 20 Cal.4th 546, 611 [85 Cal.Rptr.2d 132, 976 P.2d 683].) After intent to rape is established, the special circumstance is applicable regardless of whether actual penetration occurred before or after death. (*Ibid.*, citing *People v. Kelly*, *supra*, 1 Cal.4th at p. 525.)

The jury was properly instructed on the legal definition of death and on how to weigh the opinions of conflicting experts. It ultimately chose to give more weight to the testimony of Dr. Ernoehazy, and his testimony is consistent with the physical evidence. Both his testimony and the physical evidence support the conclusion that the intercourse was against April's will and that she was alive at the moment of penetration.

 For the felony-murder rape and felony-murder child-sexual-molestation special circumstances to have been found true, the jury had only to find that the rape was an " 'independent purpose' " in the killing of April (*People v. Carpenter* (1997) 15 Cal.4th 312, 387 [63 Cal.Rptr.2d 1, 935 P.2d 708]), such that defendant intended to commit rape and the rape and killing were part of one continuous transaction. (*People v. Proctor* (1992) 4 Cal.4th 499, 536 [15 Cal.Rptr.2d 340, 842 P.2d 1100].) This much was clearly established by the evidence. (*People v. Earp* (1999) 20 Cal.4th 826, 888 [85 Cal.Rptr.2d 857, 978 P.2d 15]; *People v. Proctor*, *supra*, 4 Cal.4th at p. 536.)

Reviewing the whole record in the light most favorable to the judgment below, we conclude the evidence offered at trial on the timing of April's death is sufficient to support defendant's convictions and the true findings for the special circumstances. (*People v. Lewis*, *supra*, 25 Cal.4th at p. 642; *People v. Johnson*, *supra*, 26 Cal.3d at p. 578.)

### G. *Exclusion of Proposed Expert Testimony on "Spillover" Rage.*

The trial court excluded some of defendant's proposed expert testimony from Dr. William Vicary, a forensic psychiatrist, on brain physiology, neurotransmitters, spillover rage, and defendant's mental condition during his interviews. The court concluded that the evidence was for the purpose of establishing a diminished capacity defense which had been abolished by sections 28 and 29. Defendant contends that exclusion of this evidence was error in violation of his Sixth Amendment right to present witnesses in his defense and his Fourteenth Amendment right to due process of law. We disagree.

 A criminal defendant has the due process right to the assistance of expert witnesses, including the right to consult with a psychiatrist or psychologist, if necessary, to prepare his defense. (*Ake v. Oklahoma* (1985) 470

U.S. 68, 83 [84 L.Ed.2d 53, 105 S.Ct. 1087].) The Sixth and Fourteenth Amendments to the United States Constitution also guarantee a defendant's right to present the testimony of these expert witnesses at trial. (*Doe v. Superior Court* (1995) 39 Cal.App.4th 538, 543 [45 Cal.Rptr.2d 888].)

 Nonetheless, expert psychiatric testimony may be limited by statute. (*People v. Saille* (1991) 54 Cal.3d 1103, 1111 [2 Cal.Rptr.2d 364, 820 P.2d 588].) Section 28, subdivision (a) provides that evidence of mental illness "shall not be admitted to show or negate the capacity to form any mental state." Subdivision (b) of section 28 states that as a "matter of public policy there shall be no defense of diminished capacity, diminished responsibility, or irresistible impulse in a criminal action . . . ." Section 29 prohibits expert witnesses from directly stating their conclusions regarding whether a defendant possessed a required mental state. It provides, "[i]n the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states . . . . The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."

Dr. Vicary was allowed to testify about the spillover concept in the abstract and how it might relate to defendant's conduct on the day of the murders. Vicary testified, "I think he exploded. I mean, he was in a rage and a frenzy that lasted several minutes. The provocation with the argument [with Mary] . . . . The little girl came afterwards, when he was in the bathroom, still in the frenzy, still in a rage and she was an innocent bystander, just happened on the scene." Defense counsel highlighted this testimony in his closing statement, pointing to Dr. Vicary's testimony on spillover and how it was defendant's blind rage that led him to kill April.

The court also allowed Vicary's expert opinion testimony on defendant's personality characteristics, whether defendant formed or acquired the relevant mental states, and his review of all available information on defendant. This testimony included the effects of alcohol on the central nervous system, defendant's general personality and makeup, defendant's mental condition on the date of the killings, and evidence from psychological tests that were administered to defendant. But the trial court excluded Dr. Vicary's testimony on spillover rage that related to whether defendant actually had the requisite mental state, testimony on general brain physiology that dealt with capacity to form a mental state, and testimony on neurotransmitters and those elements of spillover that amounted to capacity evidence. The court concluded that such testimony fell within the direct purview of section 28's prohibition of a defense of diminished capacity and section 29's prohibition of expert testimony on whether the defendant had the required mental state. The trial court

also excluded Dr. Vicary's observations regarding defendant's mental condition during their interviews together.

 Under a claim of state statutory error, we review a trial court's decision to admit expert testimony using an abuse of discretion standard. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299 [283 Cal.Rptr. 382, 812 P.2d 563].) We conclude the trial court's decision to limit expert testimony was not an abuse of its discretion. Considerable expert testimony was admitted regarding spillover rage and defendant's mental condition. (*People v. Jones* (1998) 17 Cal.4th 279, 304 [70 Cal.Rptr.2d 793, 949 P.2d 890].) Those portions of the testimony that were excluded were narrow and fell directly within the prohibitions of sections 28 and 29.

Even if the trial court did commit error in excluding the expert testimony on brain physiology, neurotransmitters, spillover rage, or Dr. Vicary's observations of defendant's mental condition during his interviews, we conclude that it was not prejudicial. (*McDonald, supra,* 37 Cal.3d at p. 376.) In light of the fact that the substance of Dr. Vicary's testimony was presented to the jury, it is not reasonably probable that the error affected the outcome. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) For the same reasons, with regard to defendant's federal constitutional claims, we concluded that if there was error, it was harmless beyond a reasonable doubt. (*People v. Carrera* (1989) 49 Cal.3d 291, 313 [261 Cal.Rptr. 348, 777 P.2d 121]; see also *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].)

H. *Admission of Victim's Statement to a Coworker.*

Defendant claims that his rights to confrontation, due process of law, and a fair determination of guilt and penalty under the California Evidence Code and the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution were violated when the trial court admitted a purported hearsay statement of the victim offered to show her alleged fear of defendant. This claim has no merit.

At trial, Susan Hunsacker took the stand and testified that she saw Mary at work the day before her death. She stated that Mary seemed "very nervous" and fearful of defendant. On cross-examination, defense counsel asked Hunsacker how Mary had manifested her alleged nervousness, whether Mary had said she and defendant had been arguing and what about, and whether Mary had told her that defendant refused to work.

On redirect, the prosecutor asked for more details about the conversation between Hunsacker and Mary. Hunsacker testified that Mary complained that

she had saved $300 to fix her car, but that defendant wanted to use the money for himself. The prosecution then asked what Mary's response to this was, and Hunsacker continued, "On the Saturday before her death, she looked at me and she said, 'I finally told him no. I wonder what he's going to do to me.' "

During closing argument, the prosecutor urged the jury to consider Hunsacker's testimony, suggesting that intent, malice, and premeditation could all be inferred from the statement, "I wonder what he's going to do to me."

Defendant's claim is without merit. Even assuming the statement was admitted in error, such error was harmless under any standard in light of the fact that testimony as to Mary's state of mind was not particularly inculpatory and that evidence of defendant's guilt was overwhelming.

I. *Admission of Autopsy and Crime Scene Photographs.*

Defendant next contends the trial court erred by admitting into evidence nine crime scene and autopsy photographs in violation of Evidence Code section 352, the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and federal and state constitutional rights to an impartial jury and to due process of law. These claims have no merit.

The prosecution initially sought to introduce 181 photographic slides of the crime scene and victims; nine were admitted into evidence. The slides in question show crime scene and autopsy photographs of the two victims.

■ Under section 352, it is proper to admit relevant evidence when the probative value of that evidence is not substantially outweighed by its prejudicial effect. (*People v. Scheid* (1997) 16 Cal.4th 1, 13 [65 Cal.Rptr.2d 348, 939 P.2d 748].) The trial court's decision is reviewed for abuse of discretion. (*People v. Hardy* (1992) 2 Cal.4th 86, 199–200 [5 Cal.Rptr.2d 796, 825 P.2d 781].)

The record reveals that the court carefully reviewed the submitted photographs and selected just nine of the original 181 slides proposed by the prosecution to be introduced into evidence. These nine slides depict certain key aspects of evidence that were in contention at trial. The slides of April illustrate where the body was found, aspects of how the crime was committed, and the location and nature of some of the wounds. They are probative of whether April was raped because they illustrate blood flow evidence and thus whether April was alive at the time of penetration. The slides indicate as well the manner in which April was raped, the position of her sweatshirt on the body, and the placement of blood clots. Also visible is a defensive wound on

April's left wrist, illustrating her attempts to fight off defendant's attack. The slides of Mary show the manner and severity of the wounds to her neck, and illustrate the pathologist's testimony regarding the type of weapon that may have caused the wounds and whether the knife point may have broken off.

The nine slides admitted corroborate the testimonial evidence and were relevant to the ultimate determination of guilt. (See *People v. Raley* (1992) 2 Cal.4th 870, 914 [8 Cal.Rptr.2d 678, 830 P.2d 712].) The slides were neither particularly gruesome nor inflammatory, and the record shows that the trial court properly weighed their probative value and prejudicial effect. The court did not abuse its discretion under Evidence Code section 352 in concluding the probative value of this evidence was not substantially outweighed by its prejudicial effect. (*People v. Sanchez* (1995) 12 Cal.4th 1, 64 [47 Cal.Rptr.2d 843, 906 P.2d 1129].) Nor was there cumulative prejudice to defendant. As we stated in *People v. Price* (1991) 1 Cal.4th 324, 441 [3 Cal.Rptr.2d 106, 821 P.2d 610], "We have often rejected the argument that photographs of a murder victim should be excluded as cumulative if the facts for which the photographs are offered have been established by testimony."

### J. *Prosecutorial Misconduct in Closing Argument.*

Defendant next contends the prosecutor committed misconduct during her closing argument in the guilt phase of the trial, in violation of due process of law under the Fifth and Fourteenth Amendments, as well as the Eighth Amendment right to a reliable determination of penalty, of the United States Constitution. Because defense counsel failed to object or seek an admonishment as to any of these asserted instances of misconduct, defendant has forfeited the point for appeal unless an admonition would have been useless to cure the alleged harm. (*People v. Dennis* (1998) 17 Cal.4th 468, 517–518 [71 Cal.Rptr.2d 680, 950 P.2d 1035]; *People v. Ochoa* (1998) 19 Cal.4th 353, 427–428 [79 Cal.Rptr.2d 408, 966 P.2d 442].) We conclude that no such harm appears in the record before us.

The prosecutor used a number of epithets and derogatory language in her closing argument, including references to defendant as "that animal," as "vicious," as a "base individual," and as someone who acted from "vile, base motives" once he realized that his "gravy train was over." When warranted by the evidence, the use of such epithets is not improper. (*People v. Fosselman* (1983) 33 Cal.3d 572, 580 [189 Cal.Rptr. 855, 659 P.2d 1144]; see also *People v. Thompson* (1988) 45 Cal.3d 86, 112 [246 Cal.Rptr. 245, 753 P.2d 37] ["[A] prosecutor may vigorously argue his case, marshalling the facts and arguing inferences to be drawn therefrom"].) Although defendant singles out words and phrases, or at most a few sentences, to demonstrate misconduct, we must view the statements in the context of the argument as a whole.

(*People v. Lucas* (1995) 12 Cal.4th 415, 475 [48 Cal.Rptr.2d 525, 907 P.2d 373].) Even if some of the purported epithets crossed the line into prosecutorial misconduct, none were so outrageous or inherently prejudicial that an admonition could not have cured them.

We therefore find defendant's prosecutorial misconduct claims forfeited. (*People v. Dennis, supra,* 17 Cal.4th at pp. 517–518.)

### K. *Guilt Phase Jury Instruction Challenges.*

#### 1. *Instruction of CALJIC Nos. 2.03 and 2.06.*

Defendant contends that the trial court violated his constitutional right to due process of law under the federal and state Constitutions by giving the jury two instructions concerning consciousness of guilt even though he had confessed to the crime.[10] Specifically, defendant makes the following arguments: (1) the jury should not be given a consciousness of guilt instruction when the defendant confesses, because nothing in the instruction limits the scope of inference of guilt that the jury could draw if it found that defendant had made even one false or misleading statement; (2) even though the instruction creates a permissive inference, such an instruction is improper when the evidence does not permit a rational juror to make such an inference; (3) the instruction does not state to which charge the instructions are applicable, thereby allowing the jury to infer consciousness of guilt on all four offenses and all four special circumstances, including an inference as to which degree of murder the defendant had committed, thereby impermissibly lowering the prosecution's burden of proof.

We considered and rejected similar challenges to the same two consciousness of guilt instructions in *People v. Crandell* (1988) 46 Cal.3d 833 [251 Cal.Rptr. 227, 760 P.2d 423] (*Crandell*). We stated, "The instructions advise the jury to determine what significance, if any, should be given to evidence of consciousness of guilt, and caution that such evidence is not sufficient to establish guilt, thereby clearly implying that the evidence is not the equivalent of a confession and is to be evaluated with reason and common sense.

---

[10] The two instructions given at trial follow:

CALJIC No. 2.03 states: "If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider such statement as a circumstance tending to prove a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your determination."

CALJIC No. 2.06 states: "If you find that a defendant attempted to suppress evidence against himself in any manner, such as by destroying evidence or by concealing evidence, such attempt may be considered by you as a circumstance tending to show a consciousness of guilt, and its weight and significance, if any, are matters for your consideration."

The instructions do not address the defendant's mental state at the time of the offense and do not direct or compel the drawing of impermissible inferences in regard thereto." (*Id.* at p. 871.)

 A rational juror could permissibly infer consciousness of guilt from defendant's own statement—specifically, the note that defendant left for the children following the killings that said, "Mom and I went out for a while. Behave yourselves and we will see you after school. Love you both, M [Mom] and N. [Nick]." Even though the instructions do not state to which charge the instructions are applicable, no such limitation is legally required, nor did defendant request such a limitation or modified instruction at trial. As we have previously stated, false statements regarding a crime "show a consciousness of guilt of all the offenses committed during a single attack." (*People v. Griffin* (1988) 46 Cal.3d 1011, 1027 [251 Cal.Rptr. 643, 761 P.2d 103].) No limitation is necessary because "[t]he instructions do not assume the existence of evidence relating to each charge." (*Crandell, supra,* 46 Cal.3d at p. 870.)[11]

Even assuming that the trial judge erred in giving these instructions, defendant suffered no prejudice as a result. The evidence linking defendant to the crimes, including his own two-hour audiotaped confession was so substantial that "[t]he impact of an inference of consciousness of guilt could not have resulted in a miscarriage of justice." (*People v. Mattson* (1990) 50 Cal.3d 826, 872 [268 Cal.Rptr. 802, 789 P.2d 983], citing *People v. Watson, supra,* 46 Cal.2d at p. 836.)

### 2. *Instruction with CALJIC No. 2.50.*

Defendant claims that instructing with CALJIC No. 2.50, concerning evidence of other crimes, violated his due process rights under the federal and state Constitutions because the "other crimes" cited by the prosecution in calling for the instruction were not crimes at all but, instead, uncharged incidents of misconduct relating to defendant's treatment of Mary James.[12]

---

[11] Defendant further argues that any such inference of a consciousness of guilt of wrongdoing was not relevant to any disputed issue in light of his confession. We disagree. Defendant's confession did not establish the degree of the murders or whether he acted with malice and therefore did not render the inference irrelevant or superfluous.

[12] The judge read the following version of CALJIC No. 2.50 to the jury: "Evidence has been introduced for the purpose of showing that the defendant committed a crime other than that for which he is on trial. [¶] Such evidence, if believed, was not received and may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes. [¶] Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show: [¶] The existence of the intent which is a necessary element of the crime charged; [¶] The identity of the person who committed the crime, if any, of which the defendant is accused; [¶] A motive for the

Defendant claims that because the jury was not told to which incidents the instruction referred, the jury must have considered this instruction to apply to the only crimes of which defendant had been previously convicted—property crimes, none of which show motive, intent, or identity with respect to any of the counts or special circumstances. His claim is unfounded.

CALJIC No. 2.50 addresses the admission of prior crimes evidence to show motive, intent, or identity. The incidents in dispute were potentially crimes and they shed light on defendant's motive, identity, and intent to murder his wife. In the first incident, which occurred one or two weeks before the murders, the defendant held his wife on the bed while she was crying and said, "Leave me alone." In the second incident, during an argument with his wife in their backyard, defendant pushed his wife into a wall and said, "You stupid bitch, just wait until I get you." He also told her, "This is what you deserve."

 "Evidence tending to establish prior quarrels between a defendant and decedent and the making of threats by the former is properly admitted . . . to show the motive and state of mind of the defendant." (*People v. Cartier* (1960) 54 Cal.2d 300, 311 [5 Cal.Rptr. 573, 353 P.2d 53]; see also *People v. De Moss* (1935) 4 Cal.2d 469, 473 [50 P.2d 1031] ["quarrels and separations of the parties, together with the threats of defendant, establish sufficient motive for the killing"].) Similarly, "evidence of threats of violence by an accused against the victim of an offense is proof of the identity of the offender." (*People v. Daniels* (1971) 16 Cal.App.3d 36, 46 [93 Cal.Rptr. 628]; see *People v. Linkenauger* (1995) 32 Cal.App.4th 1603, 1610 [38 Cal.Rptr.2d 868].)

Further, the judge properly used CALJIC No. 2.50 to inform the jury that it may consider the "other crimes" evidence to show only identity, intent, or motive. After both parties agreed, the court deleted from the CALJIC No. 2.50 form instruction inapplicable references to knowledge of means necessary for the commission of the crime and of the existence of a larger conspiracy. The court rejected defendant's request that the instruction be further modified to say that it did not refer to defendant's prior property-related crimes. CALJIC No. 2.50 simply "tells the jury what inferences could be drawn from the marital discord and prior assault evidence," and that such evidence may not be used for any other purpose. (*People v. Linkenauger, supra,* 32 Cal.App.4th at p. 1615.) Because this uncharged misconduct evidence did reveal defendant's motive, intent, and identity, the instruction was properly given even without defendant's proposed modification.

commission of the crime charged; [¶] For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. [¶] You are not permitted to consider such evidence for any other purpose."

Even if the jury did believe that CALJIC No. 2.50 referred to the property crimes, this belief did not cause a miscarriage of justice. As stated above, the prosecutor's case, including defendant's own confession, was overwhelming, and it is not reasonably probable that a result more favorable to defendant would have been reached absent the alleged instructional error. (*People v. Watson, supra,* 46 Cal.2d at pp. 836–837.)

### 3. *Modification of CALJIC No. 8.47 Instruction.*

Defendant contends that the trial judge violated his due process rights under the federal and state Constitutions by improperly removing from the involuntary manslaughter instruction the statement that a defendant who kills while unconscious due to voluntary intoxication commits involuntary manslaughter rather than murder.[13] Defendant not only did not object to the modification at trial, he also approved the modification after agreeing that he was not unconscious at the time of the murder. He thus has forfeited the issue on appeal.

Defendant nonetheless claims that the trial judge has a sua sponte duty to give correct instructions on the defense theory of the case. Defendant is correct that the trial judge has a duty to instruct as to defenses " 'that the defendant is relying on . . . , or if there is substantial evidence supportive of such a defense *and* the defense is not inconsistent with the defendant's theory of the case.' " (*People v. Breverman* (1998) 19 Cal.4th 142, 157 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) Defendant is incorrect that voluntary intoxication constitutes a defense. Instead, voluntary intoxication "is proffered in an attempt to raise a doubt on an element of a crime which the prosecution must prove beyond a reasonable doubt." (*People v. Saille, supra,* 54 Cal.3d at p. 1120.) As such, the burden falls on the defendant to request a "pinpoint" instruction. (*Ibid.*) "[S]uch a pinpoint instruction does not involve a 'general principle of law' as that term is used in the cases that have imposed a sua sponte duty of instruction on the trial court." (*Ibid.*)

Defendant, in turn, argues that this portion of *People v. Saille, supra,* 54 Cal.3d 1120–1121, is in tension with *People v. Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913], which required a trial judge to instruct not merely on "defenses," but also on the defendant's theory of the

---

[13] As given to the jury, CALJIC No. 8.47 provided: "If you find that a defendant killed another human being without an intent to kill and without malice aforethought, the crime is involuntary manslaughter."

The unedited version of CALJIC No. 8.47, as in effect at the time of the trial, provided: "If you find that a defendant, *while unconscious as a result of voluntary intoxication,* killed another human being without an intent to kill and without malice aforethought, the crime is involuntary manslaughter." (Italics added.)

case. (See also *People v. Stewart* (1976) 16 Cal.3d 133, 140 [127 Cal.Rptr. 117, 544 P.2d 1317].) But *Saille* clarified that the defense of voluntary intoxication was an attempt to raise a reasonable doubt as to a specific element of the crime and did not trigger a judge's sua sponte duty to instruct. (*People v. Saille, supra,* 54 Cal.3d at pp. 1120–1121.)

The trial court gave a pinpoint instruction on intoxication, CALJIC No. 4.21,[14] that informed the jury that it could consider "evidence . . . that defendant was intoxicated at the time of the alleged crime . . . in determining whether the defendant had [the requisite] specific intent or mental state." The jury was therefore instructed correctly as to the relationship between defendant's intoxication and his mental state, notwithstanding the modification of CALJIC No. 8.47.

### L. *Cumulative Guilt Phase Error.*

Defendant argues that, even if no single error warrants reversal of the judgment, the cumulative effect of all the errors necessitates reversal under the due process protections in the federal and state Constitutions. We conclude there is no prejudicial error, considered either individually or cumulatively.

### IV. PENALTY PHASE ISSUES.

Defendant's claim of error in the penalty phase is limited to instructional error and constitutional challenges to the death penalty.

### A. *Penalty Phase Jury Instruction Challenges.*

#### 1. *The Trial Court's Rejection of Five Proposed Instructions.*

Defendant argues that the trial court's refusal to give five of the 10 penalty phase instructions requested by defendant constitutes reversible error and

---

[14] The judge read the following instruction: "In the crimes of murder, rape and lewd acts upon a child of which the defendant is accused in Counts I, II, III and IV of the information, and lesser included offenses and special circumstances, a necessary element is the existence in the mind of the defendant of specific intent and mental states, including malice aforethought, premeditation and deliberation. [¶] If the evidence shows that the defendant was intoxicated at the time of the alleged crime, you should consider that fact in determining whether the defendant had such specific intent or mental state. [¶] If from all the evidence you have a reasonable doubt about whether the defendant formed such specific intent or mental state, you must find that he did not have such specific intent or mental state." (Cf. CALJIC No. 4.21.)

deprived him of due process of law, equal protection, and a reliable determination of penalty in violation of his rights under the Fourteenth and Eighth Amendments. We address each of the instructions in turn.

### a. *Refused Instruction on Double-counting.*

The trial court refused to give defendant's proposed instruction No. 10, which stated: "In determining circumstances in aggravation, you should not double count any circumstances of the crime which are also special circumstances." Instead, the court gave CALJIC No. 8.85 to the jury, stating that in determining penalty, the jury should consider, "(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any circumstances found to be true." Defendant contends rejection of the proposed instruction was erroneous.

We already have determined that CALJIC No. 8.85 does not imply that the jury may "double count" evidence. (*People v. Mayfield, supra,* 14 Cal.4th at p. 805.) Even assuming that the judge should have given defendant's proposed instruction, his failure to do so was harmless. (See *People v. Melton* (1988) 44 Cal.3d 713, 768–769 [244 Cal.Rptr. 867, 750 P.2d 741].) Not only did the prosecutor argue this issue in a nonmisleading manner,[15] but as a matter of common sense, "[the jury] was unlikely to believe it should 'weigh' each special circumstance twice on the penalty 'scale.' " (*Id.* at p. 769.) Thus, the judge did not commit reversible error by failing to give the defendant's proposed instruction.

### b. *Refused Instruction on Deterrence.*

Defendant's proposed instruction No. 8, which the judge rejected, stated: "In determining whether life imprisonment without possibility of parole, or death, is the appropriate penalty, you may not consider the deterrent or non-deterrent effect of the death penalty." Defendant argues that because only

---

[15] In his closing argument at the penalty phase, the prosecutor argued: "The Court's going to talk to you about aggravating circumstances, about mitigating circumstances . . . and it's also going to tell you that you have the right to assign to those factors what weight you determine they deserve. [¶] It's not going to give you a scale that you can carry back there and say, 'Oh. Well, I'm just going to put this on the scale and see what it weighs.' [¶] It's going to tell you that you can't go down a check list and just arbitrarily say, 'I've got three factors in aggravation, and four factors in mitigation.' You can't do that. [¶] You have to assign weight. What that weight to be assigned is going to be based on you. And your personal opinions in a sense. But it's not a mechanical decision . . . you still have to ask your question, 'Is this the kind of case where a judgment of death should be returned.' "

statutory aggravating factors may be considered by the jury during their penalty phase deliberation, and deterrence is not a statutory aggravating factor, then the absence of an instruction informing the jury that they may not consider deterrence constitutes reversible error.

We disagree. The trial court characterized this instruction as "unnecessary." Deterrence was not an issue at trial, and the jury was presented neither with evidence nor argument by either side on the issue of the deterrent or nondeterrent value of the death penalty. The trial court properly refused the instruction (*People v. Welch, supra,* 20 Cal.4th at p. 765; *People v. Hines* (1997) 15 Cal.4th 997, 1066 [64 Cal.Rptr.2d 594, 938 P.2d 388]), and its absence was nonprejudicial. (*People v. Bacigalupo* (1991) 1 Cal.4th 103, 146 [2 Cal.Rptr.2d 335, 820 P.2d 559], judg. vacated and cause remanded (1992) 506 U.S. 802 [121 L.Ed.2d 5, 113 S.Ct. 32], reaffd. *People v. Bacigalupo* (1993) 6 Cal.4th 457 [24 Cal.Rptr.2d 808, 862 P.2d 808].)

### c. *Refused Instruction on Statutory Factors in Aggravation.*

Defendant's proposed instruction No. 2, which the trial court rejected, stated: "The factors listed in Sections A, B and C, which are: the circumstances of the crime, the presence or absence of prior criminal activity involving the use or attempted use of force or violence, and the presence or absence of any felony conviction are the only factors that you may consider to be aggravating factors. You are not allowed to take into account any other facts or circumstances as weighing in favor of imposing the penalty of death on the defendant."

Defendant's argument fails. The trial court is not constitutionally required to include an instruction identifying which factors are to be considered in aggravation. (*People v. Earp, supra,* 20 Cal.4th at p. 898; *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1266 [74 Cal.Rptr.2d 212, 954 P.2d 475].) We characterized a very similar argument as "display[ing] a fundamental misunderstanding of the differing constitutional requirements for the narrowing and sentence-selection aspects of a state's capital sentencing law." (*People v. Earp, supra,* 20 Cal.4th at p. 898, citing *People v. Musselwhite, supra,* 17 Cal.4th at p. 1266.) Thus, the trial judge properly declined defendant's instruction.

### d. *Refused Instruction on Scope of Mitigation Evidence.*

Defendant argues that the trial court erred in refusing to give proposed instruction No. 1. This instruction enumerated various factors to be included

in mitigation, including childhood abuse suffered by defendant and defendant's lack of emotional maturity.[16] Defendant argues that under federal law, he is entitled at the penalty phase to "clear instructions which not only do not preclude consideration of mitigating factors, [citation], but which also 'guid[e] and focu[s] the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender . . .' [citation]." (*Spivey v. Zant* (5th Cir. 1981) 661 F.2d 464, 471, quoting *Jurek v. Texas* (1976) 428 U.S. 262, 274 [49 L.Ed.2d 929, 96 S.Ct. 2950].) He is incorrect. Such a pinpoint instruction, which asks the jury to draw inferences favorable to defendant regarding particular items of evidence, "properly belongs not in instructions, but in the arguments of counsel to the jury." (*People v. Wright* (1988) 45 Cal.3d 1126, 1135 [248 Cal.Rptr. 600, 755 P.2d 1049].)

 Defendant also argues the trial court erred in refusing to give proposed instruction No. 5, which would have instructed the jury in part that "[m]itigating factors are potentially unlimited."[17] The trial court correctly rejected this instruction as duplicative of CALJIC No. 8.85, factor (k)[18] (See *Benson, supra,* 52 Cal.3d at p. 805, fn. 12; *People v. Farmer* (1989) 47 Cal.3d 888, 889–890 [254 Cal.Rptr. 508, 765 P.2d 940].) This court has interpreted section 190.3 factor (k), which CALJIC No. 8.85, factor (k) incorporates, as " 'allow[ing] the jury

---

[16] Defense counsel's proposed instruction No. 1 read: "Possible circumstances in mitigation you may consider if you find them relevant and supported by the evidence include but are not limited to the following: [¶] (1) The presence or absence of emotional abuse or neglect during the defendant's childhood; (2) The defendant's mental and emotional maturity or lack thereof; (3) Whether or not the offense was committed while the defendant was under the influence of mental or emotional disturbance; (4) The defendant's statement, or lack thereof, to law enforcement officers regarding his involvement in the crime at an early stage of the proceedings; (5) Whether or not the defendant expressed remorse or shame for his crime. [¶] The order or labeling [*sic*] of the factors in these instructions is not intended to suggest to you their level of importance or significance. You are to give each applicable factor the weight that you deem appropriate."

[17] Defense counsel's proposed jury instruction No. 5 read: "Mitigating factors are potentially unlimited. The mitigating factors provided in the instructions are merely examples of some of the factors you may take into account in deciding not to impose the death sentence. You may also consider any other facts relating to the circumstances of the case or to the character and background of the defendant as a reason for not imposing the sentence of death."

[18] CALJIC No. 8.85(k) provides that the jury may consider in mitigation: "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial. You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle."

to consider a virtually unlimited range of mitigating circumstances.' " (*People v. Smithey* (1999) 20 Cal.4th 936, 1007 [86 Cal.Rptr.2d 243, 978 P.2d 1171], quoting *People v. McPeters, supra,* 2 Cal.4th at p. 1192.) The jury was thus "not reasonably likely to have [been] misled . . . into believing that its consideration of mitigating circumstances somehow was limited." (*People v. Smithey, supra,* 20 Cal.4th at p. 1007.)

### 2. *Proposed Instruction on Work Credits.*

Defendant contends that the trial court erred in refusing to instruct the jury that inmates sentenced to life imprisonment without possibility of parole may not have their sentences reduced for work credits, thus violating his right to due process of law under the Fifth and Fourteenth Amendments to the United States Constitution, and a reliable determination of penalty under the Eighth Amendment. We find this contention to be without merit.

#### a. *Background.*

While defendant was imprisoned at the Sierra Conservation Center, he worked as an office assistant and reported to Ann Hackett. At trial, Hackett testified about defendant's work ethic. During questioning, the prosecutor asked Hackett, "Do inmates get their sentence[s] reduced for working?" Defense counsel objected that the issue was irrelevant to the case. The trial court sustained the defense objection before Hackett could answer the question. At a sidebar, defense counsel asked the trial court to remind the jury that a person sentenced to life imprisonment without possibility of parole could not have his sentence reduced for working. The trial court responded that the issue should be dealt with later in the trial when crafting jury instructions.

During a discussion of proposed jury instructions, defense counsel renewed his verbal objection, but never offered a written instruction on this issue, even after the trial court asked if proposed written instructions were available. Defense counsel did not prepare written instructions even after the prosecutor verbally proposed to stipulate to instructions that addressed some of defendant's concerns. When the trial court asked for clarification about whether defendant was also objecting to the rejection of the work credit instruction, defense counsel stated, "No, I don't mean on that [one] . . . ."

#### b. *Discussion.*

Even if defendant properly preserved this issue for appeal, the trial court committed no error. The court sustained defendant's objection to the prosecutor's question suggesting that work credits could reduce a sentence of life

imprisonment without possibility of parole. The prompt action on the part of defense counsel and the trial court was sufficient to dispel any prejudice from the prosecution's unanswered inquiry. (*People v. Bonillas* (1989) 48 Cal.3d 757, 795 [257 Cal.Rptr. 895, 771 P.2d 844].)

■ Furthermore, a judge need not include a legally correct jury instruction when it is duplicative of other instructions provided to the jury. (*People v. Sanders* (1995) 11 Cal.4th 475, 560 [46 Cal.Rptr.2d 751, 905 P.2d 420]; see also *People v. Gurule* (2002) 28 Cal.4th 557, 659 [123 Cal.Rptr.2d 345, 51 P.3d 224].) Here, the judge told the jurors that they should not consider any question as evidence, and should not guess the answers to any questions that were not answered because the judge sustained objections. Moreover, the jurors received a special instruction directing that if they convicted defendant of life imprisonment without possibility of parole, his sentence would be carried out and he would never be eligible for parole. These instructions conveyed the same information as defendant's verbally proposed instruction.

### 3. *Instruction on Extreme Mental or Emotional Disturbance.*

During the penalty phase of the trial, the trial court read the standard CALJIC No. 8.85 instruction, drawn from section 190.3, to advise jurors of the mitigating factors they should consider when choosing an appropriate sentence. Defendant now objects to factor (d) of the instruction, which states that one of the factors a juror may consider in imposing the penalty is "[w]hether or not the offense was committed while the defendant was under the influence of *extreme* mental or emotional disturbance." (Italics added.) Defendant contends that the inclusion of "extreme" mental or emotional disturbance under factor (d) of CALJIC No. 8.85 precluded jurors from considering lesser mental or emotional disturbance as a mitigating factor, contrary to the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

■ We disagree. As noted, the jury also received CALJIC No. 8.85, factor (k), the catchall provision, that informed them that they could consider "any other circumstance which extenuates the gravity of the crime, and any sympathetic or other aspects of the defendant's character or record that the defendant offers as a basis for a sentence less than death."[19] (See § 190.3, factor (k).) CALJIC No. 8.85, factor (k), does not contradict, confuse, or subsume factor (d), but rather complements factor (d). CALJIC No. 8.85, factor (k) allows the jury to consider " ' "a mental condition of the defendant which, though perhaps not deemed 'extreme,' nonetheless mitigates the

---

[19] See footnote 18, *ante*, for the full text of CALJIC No. 8.85, factor (k).

seriousness of the offense." ' " (*People v. Sapp* (2003) 31 Cal.4th 240, 316 [2 Cal.Rptr.3d 554, 73 P.3d 433].) The United States Supreme Court, analyzing a predecessor version of factor (k), found that "there is not a reasonable likelihood that [the jury] interpreted the instruction[] to prevent the consideration of [other types of] mitigating evidence . . . ." (*Boyde v. California* (1990) 494 U.S. 370, 381 [108 L.Ed.2d 316, 110 S.Ct. 1190].) Therefore, CALJIC No. 8.85, factor (d) was proper and did not violate defendant's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. (See, e.g., *People v. Sapp, supra,* 31 Cal.4th at p. 316; *People v. Wright* (1990) 52 Cal.3d 367, 443–444 [276 Cal.Rptr. 731, 802 P.2d 221].)

### 4. *Refused Instructions and Cumulative Prejudice.*

Defendant claims that even if no single error justifies reversal, the cumulative effect of the asserted numerous instructional errors at the penalty phase mandates reversal. The absence of any instructional error precludes this argument. (*People v. Beeler* (1995) 9 Cal.4th 953, 994 [39 Cal.Rptr.2d 607, 891 P.2d 153].)

### B. *Constitutionality of Death Penalty Law.*

Defendant contends that various features of California's capital sentencing scheme violate the federal Constitution, particularly his due process rights and Eighth Amendment right to meaningful appellate review of his case. We have previously rejected these challenges, and do so again today.

■ This court recently reaffirmed its long-standing holding that a jury is not required to produce written findings on the circumstances it finds aggravating. (*People v. Yeoman* (2003) 31 Cal.4th 93, 165 [2 Cal.Rptr.3d 186, 72 P.3d 1166].) ■ A jury need not reach unanimous findings on aggravating factors used to sentence a defendant to death. (*People v. Danks* (2004) 32 Cal.4th 269, 316 [8 Cal.Rptr.3d 767, 82 P.3d 1249]; *People v. Prieto* (2003) 30 Cal.4th 226, 263, 275 [133 Cal.Rptr.2d 18, 66 P.3d 1123]; *People v. Medina* (1995) 11 Cal.4th 694, 782 [47 Cal.Rptr.2d 165, 906 P.2d 2].)

■ Section 190.2 adequately performs the narrowing function mandated by the Eighth Amendment to the federal Constitution. (*People v. Crittenden* (1994) 9 Cal.4th 83, 155–156 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People v. Bacigalupo, supra,* 6 Cal.4th at pp. 466–467.) Our capital sentencing scheme

does not contain so many special circumstances that it fails to perform the constitutionally mandated narrowing function. (*People v. Ray* (1996) 13 Cal.4th 313, 356–357 [52 Cal.Rptr.2d 296, 914 P.2d 846]; see also *People v. Bacigalupo, supra,* 6 Cal.4th at pp. 465–468.) In addition, the statutory categories have not been construed in an unduly expansive manner. (*People v. Crittenden, supra,* 9 Cal.4th at pp. 154–156.) The breadth of the prosecutor's discretion in choosing to seek the death penalty does not render it unconstitutional. (*People v. Stanley, supra,* 10 Cal.4th at p. 843.) Finally, the jury need not find beyond a reasonable doubt that death is the appropriate penalty. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1101 [25 Cal.Rptr.2d 867, 864 P.2d 40], overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

 We have held that the United States Constitution does not require that the jury be instructed on a presumption in favor of the sentence of life imprisonment without the possibility of parole. (*People v. Arias* (1996) 13 Cal.4th 92, 190 [51 Cal.Rptr.2d 770, 913 P.2d 980].) The death penalty law is constitutional though it does not provide for intercase proportionality review. (*People v. Anderson* (2001) 25 Cal.4th 543, 602 [106 Cal.Rptr.2d 575, 22 P.3d 347] [rejecting the contention that intercase proportionality review is required "as a matter of due process, equal protection, fair trial, or cruel and/or unusual punishment concerns"].) One under judgment of death does not suffer cruel and unusual punishment by the inherent delays in resolving his appeal. If the appeal results in reversal of the death judgment, he has suffered no conceivable prejudice, while, if the judgment is affirmed, the delay has prolonged his life. (*Id.* at pp. 605–606.) Nor does death by lethal injection constitute cruel or unusual punishment. (See, e.g., *People v. Jones* (2003) 29 Cal.4th 1229, 1267 [131 Cal.Rptr.2d 468, 64 P.3d 762]; *People v. Samayoa* (1997) 15 Cal.4th 795, 864 [64 Cal.Rptr.2d 400, 938 P.2d 2].)

C. *Cumulative Prejudice of Penalty Phase Errors.*

Defendant argues that the cumulative and interrelated effect of the guilt and penalty phase errors requires reversal of the penalty verdict. We have found no prejudicial error, either individually or in combination with other supposed errors, and therefore defendant's argument is without merit.

## V. Conclusion

We affirm the judgment in its entirety.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

Appellant's petition for a rehearing was denied January 19, 2005.