Filed 3/15/24  P. v. Girdner CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARTIN LEE GIRDNER,<br><br>    Defendant and Appellant. | D081498<br><br><br>(Super. Ct. No. SCD280537) |

APPEAL from a judgment of the Superior Court of San Diego County, Lisa R. Rodriguez, Judge.  Affirmed.

Kristen Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Daniel Rogers and Vincent P. LaPietra, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

On a rainy Valentine's Day in 2019, Appellant Martin Lee Girdner's girlfriend called 911 because he was acting strangely.  After he fired a rifle

from his front yard, numerous uniformed police officers arrived. When the officers announced themselves, Girdner ran into the backyard.

After hearing a gunshot from the backyard, the officers called in the SWAT team to take over. Once SWAT officers arrived, they set up a perimeter around the home. Two officers on the right side of the house near the backyard saw Girdner come into view and told him to show his hands. When Girdner instead pointed a gun at them, they exchanged gunfire. Girdner then returned to the house. About 30 minutes later, Girdner reappeared and pointed a handgun toward where the officers had been hiding, at which point two snipers shot Girdner. He was then taken into custody.

A jury found Girdner guilty of four counts of assault on a peace officer with a semiautomatic firearm (Pen. Code,[1] § 245, subd. (d)(2); counts 1–4), one count of discharging a firearm in a grossly negligent manner (§ 246.3, subd. (a); count 5), and one count of drawing or exhibiting a firearm (§ 417, subd. (a)(2); count 6). It returned true findings on thirteen firearm allegations. The trial court sentenced Girdner to nine years and eight months in state prison.

Girdner contends on appeal that the record lacks legally sufficient evidence to support his convictions under counts 1 through 4 of assault on a peace officer with a semi-automatic firearm. Specifically, he argues the prosecution failed to prove beyond a reasonable doubt that he knew, or reasonably should have known, that the individuals at whom he pointed a firearm were peace officers lawfully performing their duties.

We disagree and therefore affirm the judgment.

---

[1] Statutory references are to the Penal Code unless otherwise specified.

FACTUAL AND PROCEDURAL BACKGROUND

Girdner and his girlfriend, Rebecca L., had lived together for approximately 20 years. Starting in late 2018, Rebecca suspected Girdner had started using methamphetamine because "he wasn't himself."

On February 14, 2019, Rebecca was rushing out the door for a morning meeting when Girdner walked in after having been gone with no explanation for two days. When she returned a couple hours later, the house had a strong chemical smell and a bag that looked like a rifle case was sitting near the kitchen. Girdner announced that he was going to marry April that night, which shocked Rebecca because April was her daughter-in-law. She walked into another room and quietly texted her son and April to get out of their house because she said Girdner "is crazy" and "[h]e's got his guns." She then left the house again because she did not know what Girdner might do.

Rebecca drove to a nearby park and called the police. Her son also called the police.[2] The next-door neighbor subsequently heard two shots and saw Girdner walking back and forth from the front yard to the backyard with an 18-inch-long gun. When Rebecca's brother drove by looking for her, Girdner pointed a rifle at his car.

San Diego Police Officer Corey Stasch, a member of the SWAT team's special response K-9 team, received a call for service for a 5150 involving someone who had possibly used methamphetamine at Girdner's home. He described a 5150 as a call to speak with a person suspected of being a danger

---

[2]	At trial, Rebecca's son testified that Girdner had admitted to having started using methamphetamine about six months prior. He also explained that Girdner was very paranoid and had long thought the police and the government were evil and were out to get him. Girdner had also expressed his belief that bad things happened to law enforcement officers as retribution from God for times the police had hassled him.

to themselves or others, or who is gravely disabled.  Just over a dozen responding officers met a few blocks away at a staging area to come up with a plan before approaching Girdner.

As Officer Stasch and another officer approached the front of the house on foot, Officer Stasch made eye contact with Girdner and then saw him run from the front of the house, through a gate, to the backyard.  Officer Stasch was wearing a black K-9 unit uniform with his name embroidered in gold and San Diego Police Department badges on both shoulders, but he said the other officers there were wearing blue uniforms with name plates and the same police badges on their shoulders.

Within two minutes of approaching the house, he heard a gunshot from the back of the house.  Officer Stasch told the supervisors behind him to call in a SWAT response because it appeared they were dealing with an armed and barricaded subject.  Several officers then called out to Girdner by name (saying "Martin") and said they were from the San Diego Police Department.  In total, Officer Stasch believed the police identified themselves by voice or over a public announcement (PA) system over 20 times.

Sometime later, SWAT officers arrived and established a perimeter around the house.  One officer saw Girdner come through the gate with what appeared to be an ammunition can.  The officer called out to him to stop, but Girdner returned to the backyard.

An officer flying overhead in a police helicopter notified the dispatcher that Girdner was "in the two-story structure in the back."  Girdner then ran out of the building, under some trees, to the doorway of the house.  He was carrying a firearm.

SWAT Officers Timothy Arreola and Juan Ponce had been dispatched to cover the right side of the house and were standing in the backyard of the

neighboring house to the east behind a brown lattice fence. From this vantage point, they could see into Girdner's backyard through the fence and Officer Arreola, who was standing, could see over the fence. Officer Arreola saw Girdner walking from the direction of the house to the shed and said, "Let me see your hands."[3] He said Girdner turned and pointed a chrome handgun in his direction while taking a shooting stance. He and Officer Ponce both thought Girdner fired at them, and Officer Ponce said he felt a round go by the left side of his face, so they fired back.[4] Neither struck Girdner. Girdner then fell, got back up, disappeared from view, and then reappeared and headed toward the house.[5]

A recording from the helicopter shows Girdner later coming out from under an awning with his right hand pointing a firearm toward where the officers were hiding next door. Officer Castillo also saw Girdner pointing his gun at the officers and fired two rounds at him but missed.

Two snipers and another SWAT officer were positioned on a hill behind the house. After about 30 minutes, one sniper saw Girdner walking inside the house toward the back doors with a black gun in his hand. He said it

---

[3] Officer Arreola recalled saying, "Let me see your hands," but Officer Ponce's body worn camera reflects Officer Arreola saying "Hey, put your hands up" and then Officer Ponce saying, "Let me see your han—" before being cut off. The transcript from Officer Arreola's body worn camera attributes both statements to Officer Arreola.

[4] Officer Jacob Castillo, who was stationed in the backyard, also testified that he heard gunfire from a handgun in addition to rifle fire from the officers' rifles.

[5] Pursuant to SWAT protocol following a shooting, Officers Arreola and Ponce were then replaced by Officers Timothy Vollmar and Christopher Bernard.

appeared Girdner was trying to aim in the direction of Officers Vollmar and Bernard, who were now hiding behind the lattice fence. The sniper fired one shot at Girdner's upper torso. Girdner dropped to all fours on the outside of the house. The other sniper saw him raise up his arm and point his gun in the direction of the officers behind the lattice fence, so he fired one shot and struck Girdner.

At that point, one of the officers on the hill reported that Girdner was lying in the backyard and appeared to be injured. Officers sent in a robot to ensure he was not armed and then took him into custody.

DISCUSSION

Girder contends substantial evidence does not support the jury's finding that he knew, or reasonably should have known, that the four individuals at whom he pointed the firearm (Officers Arreola and Ponce who were then relieved by Officers Vollmar and Bernard) were peace officers lawfully performing their duties. As a result, he argues there was insufficient evidence to support his convictions on counts 1 through 4. Absent substantial evidence, he submits these convictions violated his state and federal constitutional right to due process of law. We disagree.

A.    *Legal Principals and Standard of Review*

In considering a challenge to the sufficiency of the evidence, "we must 'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 657–658 (*San Nicolas*).) We do not substitute our own factual determinations for the factfinder's (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078) as " '[r]esolution of conflicts and

6

inconsistencies in the testimony is the exclusive province of the trier of fact.' " (*People v. Brown* (2014) 59 Cal.4th 86, 106 (*Brown*).)

"The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations.] The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.] Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citation.]" ' " (*People v. Kraft* (2000) 23 Cal.4th 978, 1053–1054.)

B.    *Analysis*

The jury convicted Girdner under section 245, subdivision (d)(2) of four counts of assault on a peace officer with a semiautomatic firearm. This subdivision provides that "[a]ny person who commits an assault upon the person of a peace officer or firefighter with a semiautomatic firearm and who knows or reasonably should know that the victim is a peace officer or firefighter engaged in the performance of his or her duties, when the peace officer or firefighter is engaged in the performance of his or her duties, shall be punished by imprisonment in the state prison for five, seven, or nine years."[6] (§ 245, subd. (d)(2).) Girdner does not challenge the findings that he

---

[6]    The language in the jury instruction was phrased in the past tense: "When the defendant acted, he knew, or reasonably should have known, that the person assaulted was a peace officer who was performing his duties."

7

used a semiautomatic firearm or that the officers were lawfully engaged in the performance of their duties. His only argument on appeal is that the prosecution did not present sufficient evidence that he knew, or reasonably should have known, the four individuals behind the lattice fence were police officers.

In analyzing other penal statutes using the language "knew or reasonably should have known," appellate courts have confirmed that whether a defendant actually knew the required information is a subjective question, whereas "reasonably should have known" is an objective standard. (See, e.g., *People v. Sifuentes* (2022) 83 Cal.App.5th 217, 230 [construing section 189, subdivision (f)]; *People v. Linwood* (2003) 105 Cal.App.4th 59, 71–72 [interpreting section 261, subdivision (a)(3)].) Under the objective standard, "[i]f a reasonable person in the defendant's position would have been aware of the facts at issue, the defendant is presumed to have such knowledge." (*Sifuentes*, at p. 230.) Thus, the jury here could have found Girdner guilty if the prosecution proved beyond a reasonable doubt either that he knew the individuals behind the fence were police officers or that a reasonable person in Girdner's position would have known they were police officers.

In challenging the sufficiency of the evidence here, Girdner argues there was no evidence he knew the SWAT team was coming or had surrounded his house. He points out that he could not visually identify the officers behind the fence because they were not wearing traditional blue uniforms and the fence and rain obscured his view. He also highlights Officer Ponce's testimony that Girdner looked surprised when Officer Arreola yelled as evidence that he did not know officers were in the backyard. However, as noted above, the jury was not required to conclude Girdner *subjectively* knew

he was assaulting a police officer, so this evidence alone does not undermine the verdict.

Turning to the objective test, Girdner suggests the notion that he should have assumed a coordinated effort was taking place was purely speculative in a such a high-stress situation, and that the law should not place the burden on civilians to assume the identity of individuals who have not properly identified themselves. It is true that "[s]peculation or conjecture alone is not substantial evidence." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651; see also *People v. Hughes* (2002) 27 Cal.4th 287, 365 ["a jury may not rely upon unreasonable inferences," and " '[a]n inference is not reasonable if it is based only on speculation' "].) But as Girdner concedes, nothing in the statute expressly requires all officers to identify themselves.

Furthermore, in examining the entire record in the light most favorable to the judgment (*San Nicolas, supra*, 34 Cal.4th at pp. 657–658), we find nothing speculative or unreasonable about the jury inferring that Girdner should have known the men behind the fence were police officers. Girdner does not dispute that San Diego Police Department officers were in front of his house, that they saw him with a gun, that they called to him by name and identified themselves as San Diego police officers over the PA system, or that when he saw them, he ran to the back of his house. He further acknowledges evidence showing he brought ammunition to the front of his house. And, even after officers heard a gunshot from the backyard, Girdner did not heed instructions by the officers in the front yard to come to the front of the house with his hands up. Under these circumstances, the jury could fairly conclude that a reasonable person would infer that if the police knew he was armed, likely had fired a gun in a residential neighborhood, and was not obeying police commands, officers would not simply wait in front of the house

9

indefinitely or leave. Rather, they would take action to protect the neighbors or to apprehend the suspect.

Additionally, the evidence clearly showed that a police helicopter was circling over his home during most of the events in question. This demonstrated both that the police were continuing to monitor him and that they felt it appropriate to monitor the back, as well as the front, of the home. Within this context, when Officers Arreola and Ponce said, "[h]ey, put your hands up" and "[l]et me see your hands," a reasonable person would logically infer it was police officers speaking to him. This is particularly true given that the officers addressing him over the loudspeaker had repeatedly referenced showing them his hands. The transcript from Officer Stasch's body worn camera alone reflects Officer Stasch and the officer on the PA system instructing Girdner a total of 16 times to come out with his hands up and free of weapons, including identical orders of "put your hands up" and "[l]et me see your hands." "We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357) and affirm the judgment where, as here, the circumstances reasonably justified the jury's findings. (*Kraft*, *supra*, 23 Cal.4th at p. 1054.)

At best, Girdner's implausible argument that he had no reason to know it was peace officers, as opposed to other random armed individuals coincidentally hiding behind the fence at the same time that a police standoff was underway, asks us to reweigh the evidence and make different inferences. This is not our role in a substantial evidence review. (*Brown*, *supra*, 59 Cal.4th at p. 106.) Reversal is warranted only if "it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to

10

support [the conviction]' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331), and that is not the case here.

DISPOSITION

The judgment is affirmed.

HUFFMAN, Acting P.J.

WE CONCUR:


IRION, J.


KELETY, J.